Hester *vs.* The State.

No. 31.—JACOB MERCER, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] Where Jurors, in a criminal trial, for an offence committed before the 16th day of February, 1854, as they were called up, were asked by the Solicitor General if they had any conscientious scruples as to capital punishment, and no objection was made by the prisoner or his Counsel, the attention of the Court not being called to the same, and no decision pronounced thereon: *Held*, that no error was committed by the Court.

[2.] The Court was asked, generally, by the prisoner's Counsel, as the Jury were about retiring, to charge them " as to confessions ;" whereupon he gave them in charge the general principles on this subject, in which he stated that confessions, when freely and voluntarily made, were the highest kind of evidence ;. but in the course of his remarks, also told them that they must weigh them as any other testimony : *Held*, that this charge, under the circumstances, was sufficiently correct.

[3.] A Court should not interfere with the verdict of the Jury, because several of the principal witnesses were intoxicated at the time of the transaction, if there be other evidence, and especially the confessions of the prisoner, to support the verdict.

[4.] Voluntary drunkenness, whatever its degree, is no excuse for crime.

[5.] A statement was made in presence of a Juror, before trial, in relation to the homicide. The Juror said, " if that were so," the prisoner " ought to be hung." When called up on the panel, he was not put upon his *voir dire*, and was taken by prisoner and sworn. After verdict of guilty, a motion for new trial was submitted, based upon affidavits that he had been heard to utter the above expression : *Held*, that the Juror appeared to have no fixed opinion on the subject, or prejudice against the prisoner ; that the observation was guarded by the expression, " *if that were so,*" &c. and that such an opinion as he appeared to have formed, would no doubt have yielded to the evidence delivered under oath.

[6.] Where a unanimous verdict is returned into Court, and entered upon the minutes, the statement of one of the Jury, after he is discharged, that he had not agreed to the verdict, but suffered it to be brought in because he could not control the rest of the Jury, must be held to be contradicted by the record : *Held*, also, that a Juror cannot be suffered, in this way, to impeach the verdict.

Murder, in Stewart Superior Court. Tried before Judge CRAWFORD, October Term, 1854.

The first error assigned in this case is, that the ques--

tion, " Have you any conscientious scruples as to capital punishment," was put to the Jurors on their *voir dire*, though the offence was committed prior to the Act prescribing that question. Defendant made no objection, at the time, nor was the Court called in to decide upon the legality of the question.

The main error complained of, was the refusal of the Court to grant a new trial, on the ground that the verdict was contrary to the weight of the evidence.

The evidence submitted to the Jury was as follows :

WILEY KING was present the day of the homicide of Lee. It was done at Clem Clements', in Stewart County. The first he knew of the difficulty, Green B. Lee (the deceased) knocked down Samuel Wright and stamped him, and told him to leave, a dam scamp ; that he had promised to vote a Whig ticket and had voted a Democratic ticket. Wright, as quick as he could, got up from under Lee, and left the house. Lee was standing in the door cursing Wright when the skirmish took place. Clements and witness were leaning on the counter talking to each other. Witness heard a scrimage behind him—did not pay much attention to it at first, but hearing such a noise, he turned around to see. He saw Mercer and Lee; Lee was about one pace from Mercer, leaving the house, apparently in great haste. Witness saw blood shining on the floor, and Mercer was standing with a bloody knife in his hand; his hand and his face were both covered with blood, and blood was dripping from both. Witness stepped up to his side, saw him shut his knife and put it in his pocket. He, Mercer, followed Lee out of doors, and witness followed Mercer. Witness saw Lee lying on the ground flat of his belly ; Mercer stepped up in 4 or 5 steps of him and stopped. Witness observed to Mercer that he (the latter) had killed Lee, and that he must stay there until the families of Lee and Mercer were both sent for. Witness took hold of Mercer and a short barrelled gun which Mercer held in his hand. Upon witness telling him that he had killed Lee, Mercer said, did you see me do it? Witness told him that he did not see him hit him the lick or licks which killed him, but that he saw him, with his bloody knife and his

face and hands all dripping with blood; that he saw him shut his knife and put it in his pocket. When witness told him that, he, Mercer, after a little while, let loose the gun which he had hold, slipped his hand into his pocket, pulled out his knife and threw it away. Witness told the crowed present where they might go and find the knife; they hunted for it there and found it. Old man Lewis Lee and his family came up about this time and witness gave Mercer up to Lewis Lee —Lewis Lee was bailiff—telling L. Lee that he might do as he pleased with Mercer, and L. Lee said he would try and take care of him. Lewis Lee pressed witness, in behalf of the State, to help guard him that night. Witness said he would do no such a thing, unless he, Lee, got a rope and confined Mercer. A rope was sent for and put around Mercer's neck; witness said that somebody might give Mercer a knife to cut loose, and suggested to have his hands tied down. Another rope was obtained, and Mercer's hands tied down with it; prisoner at the bar is the Mercer spoken of by the witness; the difficulty took place a short time after dark, there was a candle burning in the room; witness was not exceeding three steps from where he saw Lee and Mercer, when he turned around to look, after hearing the skirmish; did not see or hear any body else in the room when he so turned around, except himself, Clements, Lee and Mercer; thinks that if any other one had been in the room, he would have seen him. From what he saw and heard, he thinks only the four persons above mentioned were in the room at that time. Prisoner did not have his gun inside of the room, but as witness thinks, he got it in the porch. Mercer was very bloody, the right side, the right hand and the right side of his face were all bloody and dripping with blood. Green Lee had fallen down, and as witness thinks, was dead when witness and others got out to him; he lay not more than 14 or 15 steps from the house; witness saw the wounds of Lee examined after Lee's death; saw six wounds on Lee, one was under the left jaw, and the neck vein was there cut in two; one was below that, just above the collar bone; and the vein was cut in two there also; another was on the lower part of the head,

behind about where the skull and neck join; two others were on the left side, situated rather towards the back; one was nearly, but not quite in the center of the breast. Witness thinks that one of the wounds in the side seemed to reach the hollow, and as some thought, cut his liver; the wound under the left jaw witness thinks was about an inch or two deep; it was large enough to swallow the whole knife blade.

Wiley King, cross-examined for the prisoner, says: that prisoner was, as far as witness knows, a man of peaceable and clever character. Witness had lived near him some 8 or 10 years. Green B. Lee was, as it was said, Mercer's brother-in-law. Witness knows nothing against Green B. Lee's general character for peace and quietude. Witness saw deceased on that day there drunk; deceased had a fight with Samuel Wright on the night of the day of the killing. Samuel Wright was standing near the door doing nothing, when deceased knocked him down and stamped him. Deceased told Wright, he, Wright, had promised him, deceased, to vote a Whig ticket, and that he, a damned rascal, had voted a Democratic ticket. Deceased called Wright a damned rascal and damned scamp, and told him to leave, and was abusing him up to the time the difficulty took place with deceased and prisoner. Wright did not return after deceased had knocked him down, nor did deceased knock Wright again. Deceased was standing in the door, inside of the house, cursing and abusing Wright. Wright had gone out of the house, as humble as any negro or dog, but witness does not know whether Wright went out in the piazza or out in the yard. Witness saw the fight between deceased and Samuel Wright, but did not see Mercer, the prisoner, at that time. When witness heard the scrimmage, witness turned round, but did not see prisoner strike a blow. Witness heard deceased cursing from the time deceased knocked Wright down, up to the time the scrimmage took place. Witness has frequently seen deceased and prisoner at gatherings together —so far as witness knows, they were friendly. Witness does not know that prisoner was drunk on the day the killing took place. Witness did not see prisoner drunk. Witness did not

see or hear of deceased being in any other difficulty that day or night. Witness and deceased had no difficulty with each other on that day or night. Witness was a little groggy on the fore part of that day. Witness did not drink any in the evening, according to witness's best recollection and knowledge. Witness did not drink any after three o'clock of that day. Witness was not drunk at sunset of that day. Witness did not, after sunset, have out his knife in his hands with his sleeves rolled up, and swear he would have his supper off of that crowd before he left there. Witness does not know any thing about his walking about in a rage with his sleeves rolled up after sunset of that day, cursing and swearing. Witness, at the time of the killing, lived about four miles from the place, where the killing took place. Witness moved from the place he then lived at in January last. Witness now lives in Pike County, Alabama, some sixty or seventy miles from this place. Witness was here at last Court as a witness in this case. Witness then lived where he now lives. Witness states, by way of correction, he, witness, was not drunk at sunset, but had liquor in him. Deceased, as witness looked towards the door from where he stood by the counter, was to the right of the door. Witness did not enter into any bonds as a witness, to return here until last Court.

James H. Jackson, sworn upon the part of the State, says: On the 12th day of November, 1853, at Bumbletown, Stewart County, Ga. witness, on the night of that day, had started from Bumbletown, but does not recollect how far, heard a loud noise of talking behind; witness supposing there was going to be a fight, determined to go back and see about it. When witness got back, Wiley King was holding prisoner with one hand and a double barrelled gun in the other. Mr. King said to prisoner, he, prisoner, could not leave there, and told him he had killed deceased, and that he, prisoner, could not leave. Mr. King said to prisoner you have killed Green B. Lee. Mr. Lee was lying on the ground before the door, dead—we kept prisoner there till Mr. Lee, the father of Green B. Lee came, who said prisoner had killed his son, and he should hang—pris-

oner spoke very low, and said he had done nothing more than he wanted to do, and did not care if they hung him or what they done with him. Prisoner, after this, spoke to me, witness, very low, and said he had a ten dollar gold piece which he would give me, witness, if I would cut the rope and let him get away. Witness was called upon by Mr. Lewis Lee, an officer, and required to assist in guarding the prisoner during that night. Witness was guarding prisoner, or acting as a guard, at the time prisoner offered him the ten dollar gold piece to cut the rope and let him get away. Witness went to Bumbletown in the early part of that day. Witness left to go home about a half an hour after night, and had gone some sixty yards, when he heard the noise alluded to above. Witness saw Mr. Green B. Lee and Mr. Sam'l Wright there on that day drunk, but saw no body else there drunk that day. Deceased knocked Sam'l Wright down and kicked him, as witness heard others say, before witness left. Mr. King and Mr. Clements were not drunk after night, nor was witness drunk—if there was any one in the grocery after night, that did not drink with us, witness does not know it. Witness thought all were staying to take their drams. Witness did not, on his return, see Mr. Wright immediately. Witness was not present when prisoner was tied with the rope. Mr. King and Clements assisted to guard prisoner that night. Mr. King, Clements, prisoner and myself were in the grocery when Col. Lee remarked, prisoner had killed his son, and that he should hang for it. The grocery was about 12 feet square, clear of the counter, as near as witness can guess at it. Witness thinks he did say, on his oath, before, that Col. Lee remarked that prisoner had killed his son, and that he, prisoner, should hang for it, and he still thinks Col. Lee said so. At the time the remark was made, prisoner was sitting down in the back part of the house, and was squatted down before prisoner. The offer, by the prisoner, of the ten dollar gold piece to witness, to cut the rope and let him go, was made after Col. Lee made the remark alluded to. Witness went up to prisoner after this; 'twas then the offer of the gold piece was made to witness by prisoner. Witness did

not mention to any of the guard the offer of the ten dollar gold piece to witness, on the part of the prisoner. Witness does not recollect to whom he first mentioned the offer of the bribe; it was some time after prisoner was put in jail, that witness mentioned to Col. Lee the offer of the bribe; and also the statement of prisoner to the remark of Col. Lee, that prisoner should hang. This conversation with Col. Lee occurred the first of December, about the time witness wanted to go to Alabama. Col. Lee then had witness subpœned, but does not recollect whether it was then December or a little before. Witness's home was at Mr. Barnett's and Mr. Hendrick's at and about the time witness made the communication as above. Witness has been staying at Mrs. Lee's, the mother of deceased some, early in the year, and has been picking out cotton there this fall, and was there some little in the summer.

It was sometime after prisoner came up here and was put in jail, that witness made to Col. Lee the communication, that prisoner offered witness a ten dollar gold piece to cut the rope and let him go on the night of the killing, and that witness heard prisoner say, in reply to Col. Lee's remark, that prisoner had killed his son, and should hang for it, that he had done nothing more than he wanted to do, and he did not care what they done with him—whether they hung him or not. This communication was made before witness came up here to testify at the commitment trial; witness does not know, it might not have been more than a week before.

Clem Clement's third witness, on the part of the State, says: Witness was present when Mr. Green B. Lee was killed; witness and Wiley King had been standing talking to each other across the counter; witness thinks he turned, and as he turned back, W. King turned off and started out of doors, and prisoner was in two or three feet of the door, going out; witness does not recollect that any one was in the grocery-room just before the fracas commenced, but Green B. Lee, prisoner and King. When Wiley turned and went out prisoner followed him, and witness followed prisoner; witness did not see deceased go out of the house; when we all got out deceased was lying 5 or 6

steps out in the yard and prisoner was standing, with a double-barrelled gun in his hand, in the piazza; and Wiley King said to prisoner, you have killed that man and I am going to take you, and took hold of prisoner and the gun at the same time; and after holding awhile King said, prisoner you had as well stand still, for I have got you. Then King said prisoner took something out of his pocket and tossed it off; King pointed to where the prisoner threw the knife or whatever it was, and Mr. Elias Taylor and John Mercer, prisoner's son, went to hunt the knife or whatever it was, and John Mercer found a knife —a white handle, double-bladed knife, and should take it to be worth fifty cents. The knife was bloody when it was picked up; it had fresh blood on it. When John Mercer carried some clothes home from this place, he stopped at my grocery; I believed the clothes to be those the prisoner had on when he killed dec'd; I examined the left pocket first, and found no blood in it; I then examined the right pocket, in which had apparently been a bloody knife; there was right smart of blood on these clothes. When witness noticed prisoner his right hand and his face was bloody all over; there was right smart of blood spilt on the floor of the house; there was right smart of blood also on the ground where deceased fell; deceased did not move hand nor foot, as witness could see, after he fell. The puddle of blood inside the house was some 3 or 4 feet from the door. Witness should take prisoner to have been sober that day, as prisoner did not take but two drinks that day that witness saw. All this occurred on the 12th day of last November, in the 21st district of Stewart County. Prisoner frequently visited witness's grocery; at any other day when prisoner came to witness's grocery and was asked to drink, prisoner was always ready to take some with them; but on that day he refused over and over again. Witness does not think that prisoner had the gun in the house, but does not know. Prisoner did not muster that day; prisoner was in the house at the time of the muster; prisoner looked like he was perfectly sober when he came to the grocery. Witness did not put it down that any

one asked prisoner to drink that day, and therefore he cannot say. Prisoner was particularly called on, by name, by more than one, to drink, and refused. W. King drank some that day; witness did not see him refuse that day; witness saw King, after this happened, drink; witness does not think he saw Mr. King drink any right before the fracas commenced; witness drank some that day; does not know that any one asked him to drink with them that day, and does not know that he refused to drink with any one. Mr. King was not so drunk that he did not know what he was about; witness was not drunk but had been drinking; did not consider Mr. King drunk at any time that day, but had been drinking; thinks Mr. King slacked off drinking before night; does not recollect any thing of Mr. King's cursing and swearing in witness's piazza, between sunset and dark. Witness slept, that night, on a sheep-skin in the grocery; went to sleep that night about 12 o'clock, before or after; thinks King was awake when witness went to bed; witness did not get up that night till morning, when he got up for good that day. (Question asked witness.) Did you not tell Thomas Childers, at Henry Harrison's on next morning after the killing, that you were so drunk you did not know any thing about the case? Witness answers—He did not. (Question.) Did you, at Bumbletown, a day or two after the transaction, have a conversation with Green D. Sims, in which you said that you were so drunk that you knew nothing about the case? Witness answers—He did not. Prisoner's general character, as a peaceable man, so far as I know was good; he was always peaceable about me, until that day. Witness has been acquainted with prisoner for ten or fifteen years. Dec'd, when drunk, was an insulting, turbulent and overbearing man. Witness thinks Mr. King might have had more liquor in him in the evening than at 12 o'clock, and not have shown it.

Franklin A. Cartlidge, 4th witness on the part of the State, sworn, says: Witness was at Bumbletown, in this county, on the day that Green B. Lee was killed; it was dusk when witness left there; that day, after they got through mustering, deceased jumped up into the piazza and said, all you good

Union Scott Whigs come up and take something to drink on my expenses; and prisoner said—did you hear that? and repeated it twice; and some one spoke and said—yes, but I would not care for it. Prisoner then threw himself back and run both hands into his pocket, and drew his knife so that witness could see half the handle, but did not pull it clear out, and gritted his teeth and said, mankind, I will make him suffer for them very words; I will take satisfaction out of his body before I leave this place, or before we'll leave this place, one or the other.

Examined on the part of the defence: Witness left Charles Matthis on the morning of the killing, and got to Bumbletown between 12 o'clock and sun-up, but does not recollect the exact time; as near as he can recollect, it was between 8 and 10 o'clock; when witness got to Bumbletown muster had not commenced when witness got there; Chas. L. Matthis went with witness that day; Green B. Lee commanded the muster that day; the muster took place facing the piazza, between it and the road; it is about one hundred yards from the piazza to the road. Witness returned to Stewart County in July or August, 1853; left Bumbletown about deep dusk, nearly dark, on the day of the muster; did not see Mr. King after sun-down, and the last time witness recollects him was about $\frac{1}{2}$ or $\frac{1}{4}$ hour before sun-down. Witness cannot say, at that time, that King was drunk, though he had been drinking; nor cannot say that he was half drunk, though Mr. King was mad; there had been a little fuss there that day, between Crawford and Fussell; Mr. King and deceased had no difficulty that day that witness knows of; witness was not in the grocery after sunset. From about sunset until I, witness, left, witness, as well as he can recollect, was in the yard; witness did not see King have out his knife about half hour before sun-down. Green Lee was not drunk, but had been drinking, and was in liquor; it was in the evening, after 12 o'clock, that the muster broke up. Witness cannot say that it was 2, or 3, or 5 o'clock; it was awhile after the muster broke up, that deceased jumped up into the piazza and asked all the Union Scott Whigs to come up

and take some liquor; witness cannot say whether it was half an hour, 2 hours or 3 hours; it was late in the evening; witness cannot state who was standing round prisoner at the time he made the threats against deceased, as he knew precious few men there; there were some three or four, and may be more, but I do not know the men but one, and that was Mr. Lee, the old gentleman.    Witness told Charles L. Matthis, as witness and Matthis went home, that he heard prisoner make the threats spoken of before against deceased, and Matthis was the first one witness mentioned it to; the reason witness did not tell Col. Lee of it, he was afraid he would have to be a witness. The knife which prisoner drew so witness saw the handle, was a white handle knife—kind of a round handle knife; witness thinks that that was the first day he had been to Bumbletown. Jacob Mercer, the prisoner, is the person witness heard make the threats spoken of.

Mrs. Mary Ellis.    Witness went to Bumbletown, in this county, on the night Green B. Lee was killed, in company with Mrs. Mercer, wife of prisoner, and her children; witness had heard deceased was killed—this was the cause of her going; witness heard prisoner say he did kill Green B. Lee, and would do it if it was to do again; witness was some three steps from the prisoner at the time of his saying so; witness thinks, of late years, prisoner, when drinking, was cross and contrary in his family, and lay off a good deal; witness identifies the prisoner at the bar as the one who made the assertion that he did kill the deceased, &c. and examined for the defence.    It was some 9 or 10 o'clock when witness heard prisoner make the remark, as she thinks; prisoner was in the piazza of the grocery at the time; there were a good many in the piazza at the time; there were men around prisoner at the time, closer to him than witness was; witness thinks it was Eaton Jackson was talking to prisoner at the time; if so, is not mistaken; witness expects there were a good deal more than a half dozen in the piazza at the time this remark was made.    Witness staid all night at Col. Lee's the night before she came up to town to be sworn as a witness at the commitment trial of prisoner; she

had been subpœned as a witness a day or two before that, and had been sent for by Mrs. Lee to come there and stay all night. Henry Harrison was in the piazza at the time prisoner made the remark, that he had killed deceased. Prisoner, at the time he made the remark, spoke in a common tone of voice. Witness does not recollect that she told any one of this statement of prisoner, except Mary Crompton, until she was sworn here on the commitment trial. Prisoner did not bear the name of a very quiet man in the neighborhood.

Samuel Wright, 6th witness on the part of the State, sworn, says: Witness was at Bumbletown, in the 21st dist. in this county, the morning after the killing of Green B. Lee. On that morning, witness asked prisoner how he felt; prisoner answered he would feel better if he had some coffee. Witness then asked prisoner how he felt about the scrimage or fracas of the over-night, or what he had done, his answer was, "Sam I have done nothing more than I expected I would do four years ago. Prisoner at the bar was the man witness was talking to. Prisoner was in the piazza of Clem Clements' store at the time—the remains of Green B. Lee were in the piazza at that time. Witness did not examine, but saw the wounds on the body of deceased on Sunday night. Deceased had six wounds on his body, two on the neck, one in the edge of the hair, one wound was under the ear, across the neck, wide enough to have laid witness's finger in it, an inch and a half long—it looked like it might have been an inch deep; the other wound was under the first, near the collar bone, and looked like the knife went straight in and out. There were two wounds on the left side, which witness thinks entered the hollow, the other wound was near the left nipple. From witness's examination and the appearance of the wounds on the body of Green B. Lee, witness thinks he must have come to his death from them. The upper wound on the neck looked like it went immediately across the large vein in the neck. Witness has known prisoner some 12 or 14 years; during all that time prisoner has been a peaceable and quiet man, so far as witness knows; part of this time witness lived in the yard and in the

edge of the yard of prisoner. Witness was with prisoner frequently when sober and when drunk; so far as witness knows, prisoner was particularly friendly to Green B. Lee, the deceased; witness has known deceased some 12 or 14 years; witness would count deceased, when in liquor, to be an insulting, turbulent and overbearing man, and did not seem to care who he insulted. Witness was at Bumbletown the evening of the killing; witness did not know what occurred the night of the killing. Witness was drunk and don't recollect any thing about it. Witness does not recollect any thing of being knocked down and stamped that day; witness drank some before the muster, but was not, at that time, drunk. Witness recollects all very well during the muster; witness cannot tell any thing about whether Wiley King and Clem Clements were drunk or not. Mr. Mercer, the prisoner, mustered that day; there were some 3 or 4 persons in the piazza at the time witness heard prisoner say he had done nothing more than he expected to do four years ago, &c. The prisoner said nothing about killing Mr. Lee in those remarks; does not know that he, prisoner, had any reference to it; prisoner said, about a month or two before the killing, when about to leave my house to come to Lumpkin, shook hands with me and wife and the children, and stated he was always sorry to leave his friends, for he did not know what might happen before he got back. Question. Did you not swear, at the commitment trial of prisoner, that at the time of the confession of prisoner to witness, that Wm. McCree was present? Answer: If witness so testified at that trial, witness does not now recollect; witness does not recollect that Mr. McCree was in the piazza, but to the best of his recollection he was on the ground; witness does not remember whether he swore, at the commitment trial, that G. D. Sims was present in the piazza at the time or not; witness does not recollect that he testified, at the commitment trial, as to the names of any particular persons being in the piazza at the time of the confession by prisoner to witness; witness says that it seems to him that Mr. Perkins was in the piazza, and so might Mr. Wade have been in there. At the time that pris-

oner made these confessions to witness, witness thinks he was sober enough to recollect; witness had taken one drink, that he recollects, and had drank so much the over-night, that he felt very bad at the time that prisoner made these confessions to witness; witness considered him a drunk man, but he might have been more sober than he took him to be.   Witness had' blood on him next morning after the killing—does not know how it came there.

Re-examined by the State : From the appearance of the wounds on deceased, witness thinks they were made by a knife; witness saw blood in the house, in the piazza, and out of doors, and on the counter too, on the floor and also some on a barrel head in the house.   The blood which was upon witness was on his shoulder and down his breast.   Witness does not know how he got the blood on him; the counter was about waist high; witness does not recollect sitting down by prisoner that night; witness remained on the ground the whole of Saturday night; witness was in the grocery next morning after the killing, and took a drink at the counter.   The blood on the counter looked fresh; witness says there was no other fracas the night of the killing that he knows of, except the one between prisoner and deceased; witness does not know, of his own knowledge, that there was any fracas between prisoner and deceased that night; witness saw blood, in splotches, all about over the floor; the blood on the counter was sprinkled about on the counter for 2 or 3 feet; one puddle about the size of his hand, not more than 2 feet from the end of the counter; witness had blood on his face next morning after the killing; the blood on the counter was about 2 feet from the end of the counter nearest the door.

Charles T. Connelly, 7th witness on the part of the State, says: When he was passing by Clem Clements' grocery on Sunday morning after the killing, he saw a man lying in the piazza of the grocery, in the North end, that he supposed to be deceased; he saw, at the same time, prisoner at the South end of the piazza, apparently confined; then witness drove within 25 or 30 yards where the dead man was lying, and walked towards the end of the piazza, where the dead man was lying,

and met 'squire Johnson just before he got to the end of the piazza; after a few words conversation with Mr. Johnson, we walked together to where the dead man was lying, and saw the wounds from which he supposed he had come to his death. Witness walked away from the deceased, and was called twice by the prisoner to come to him; he then went to prisoner; as he was approaching prisoner, prisoner says, Connelly, I am in strings; witness replied, I see you are, and I am sorry to see it; witness, upon approaching prisoner shook hands with him; witness then asked prisoner, Mr. Mercer, how came you to kill Lee, or what caused you to do it? His reply was, I can't tell you now what caused me to do it. I then asked Mr. Mercer if they were in a row or difficulty, that caused him to kill him; prisoner replied no, there had'nt a word passed between us. He then went on to remark, it is done as you see it there, but I cannot tell you now what caused me to do it, but I will acknowledge the whole truth to the Court. Witness saw 3 wounds upon deceased, one just back of the bur of the ear, one about midway his neck, and one just where the neck and collar bone join. The 2 wounds upon the neck had the appearance of deep wounds. From the appearance of those wounds, witness would say that deceased came to his death by reason of them. Witness, upon a further examination, saw 3 other wounds upon deceased, making in all six.

Wm. H. Cravy. Witness was jailor of this county at the last term of this Court, and has been ever since. Prisoner has been in witness's custody since then, except a very short time; witness alluded to the time prisoner made his escape from jail. Prisoner, at the time of his escape, was in jail under charge of killing Green B. Lee. Prisoner was caught and brought back. Prisoner, with James Hogan and Simeon Lester, and two negroes, at the time of making his escape, was confined in the dungeon; all got out except Lester; witness carried prisoner provisions twice a day, from the time of his commitment to the time of his escape. Witness gave prisoner, during this time, such as he had at his own table—such as coffee, &c.; witness carried prisoner as good as he had himself; witness had coffee,

bread and meat, sometimes flour bread, sometimes corn bread; if any flour bread was left, it was carried; if not, witness did not wait to have any more baked; witness does not know, but thinks he carried prisoner coffee every day until his escape; witness thinks prisoner broke out of jail some time in April or May, shortly after our last. Superior Court; witness did not see prisoner when he went out of jail; witness does not know whether prisoner sought to do witness any injury or not in his effort to get away; witness had not been to jail the day prisoner broke out since morning; 'twas then about night, at the time prisoner went out of jail; witness had unlocked the jail; if prisoner offered to do witness any hurt he did not see or hear it; witness thinks that prisoner was the cause of witness' going into the dungeon; when witness went to the dungeon, a negro who was confined within, asked witness to take a piece of money and get him some tobacco; witness paying no attention to it, the prisoner at the bar remarked that the negro had but a short time to live, and thought he ought to have all the luxuries he could procure, whereupon he went into the dungeon to get the money, supposing the negroes were chained.

Green D. Sims for defence: Witness was at Bumbletown on the morning after the killing of Green B. Lee.   On that day, Sunday evening, witness had a conversation with Clem Clements in regard to the difficulty of the evening before.   Clements told witness that he was drunk, and did not know any thing about it.   When witness went to Bumbletown about 9 or 10 o'clock on Sunday morning prisoner was tied.   Witness tried to rouse prisoner up but could not; witness considered prisoner at that time drunk.

Charles L. Matthis : Witness was at the place called Bumbletown, in this county, the day Green B. Lee was killed, at night; witness left there between sunset and dark; about dusk Clem Clements was, as witness thinks, drunk—the reason witness thinks Clements was drunk, witness, about the time he was leaving, called to Clements for some liquor; Clements was resting on the counter, his head lying over it and paid no atten-

tion to it; witness noticed the prisoner sitting in the piazza late in the evening drunk; the last witness noticed Wiley King was between sunset and dark, or about sundown; at that time King was charging round there; witness thought King was going to get into a fight; King passed by witness and others with his sleeves rolled up; and remarked he was going to eat his supper off that crowd, or could do it that night, remarking that some 2 years before he had been cut to pieces there; witness thought King pretty drunk at that time.

Examined by the State: Witness had a conversation with W. W. Lee in the month of last December about this transaction at Col. Lee's house; in that conversation, witness told W. W. Lee that prisoner drank less the day of the killing than usual; witness knows of no difficulty which ever occurred between prisoner and deceased; witness drank some; was not drunk; went there sober and came away sober; had taken a drink or two in the course of the day; witness did not hear prisoner say that he killed deceased; Clem Clements is pretty deaf, but sometimes can hear very well, at other times he cannot.

Thomas Childer, witness sworn for the defendant, says : Witness went to Bumbletown some two or three hours by sun on Sunday morning, after the killing of Green B. Lee; witness asked for Clem Clements when witness arrived, and was told he was at Mr. Harrison's; witness went over there; witness went into the house, and at the fireside witness found Mr. Clements; witness asked Mr. Clements to tell him about the murder scrape; Clements told witness he could not do it, for he was very drunk. Clem Clements did tell witness at Henry Harrison's, on the morning after the difficulty, that he, Clements, was so drunk that he knew nothing about the case. No one was present at Harrison's at the time the conversation alluded to above took place, except witness and Clements. Mr. Harrison's house has two rooms; Clements was in the North room; witness and Clements remained in conversation only for a short time; no one came in during the time that witness re-

collects; witness was duly sober that morning—had not drank a drop up to that time.

Jno. Mercer. Witness was at Bumbletown the day Green B. Lee was killed, at night; left Bumbletown half an hour after dark; prisoner, at the time witness left, was drunker than witness had ever seen him before; witness went back to Bumbletown that night, and remained there all night; liquor was given prisoner that night; prisoner was as drunk, if not drunker, till next morning, as he was the over night.

Samuel S. Johnson. Witness was at Bumbletown the day that Green B. Lee was killed, at night. Witness left between sunset and dark; witness returned about 12 at night; witness lives better than 4 miles from Bumbletown; a negro of Col. Lee's came after witness; witness remained at Bumbletown the balance of the night; after witness returned, prisoner was drinking liquor during that night; witness would consider prisoner drunk next morning; witness did not notice Clem Clements particularly, at any time that evening. Witness and McGee were the officers who committed prisoner to jail; after witness returned to Bumbletown that night, after the killing, witness noticed that prisoner's clothes were very bloody; witness identifies the knife presented as the knife produced at the commitment trial, or one so much like it that witness would take it for the same; witness remembers it because of its being a white handle knife and having peculiar spots on the handle; the knife was bloody at that time—'tis bloody now; witness saw prisoner with just such a knife the evening before deceased was killed; witness takes this to be the same knife prisoner had in the evening of the killing; witness came with prisoner to Lumpkin; prisoner attempted to get away from them between this and John Ball's mill; he tried to escape about a mile from this place; prisoner got, at that time, some sixty or seventy yards from the road; Mr. Hendrick overtook prisoner; prisoner jumped off his horse and ran on foot; witness thinks this occurred on Sunday evening after the killing; prisoner had been drinking, but was soberer than he had been; witness thinks, at that time, pris-

oner could beat witness running; prisoner's hands were tied at the time; witness met prisoner and the crowd bringing him to Lumpkin, between the 11 and 12 mile posts, from town, and witness came on with them.   At the commitment of prisoner, witness asked prisoner what he killed Green B. Lee for?   Prisoner answered—he did not know, for he had nothing against him.

D. W. C. Thornton, witness for defendant, sworn, says: Witness was at Bumbletown the day of the muster, the day the difficulty occurred, at night; witness left there half or an hour by sun, in the evening; witness's impression, at the time was, that prisoner, at the time witness left, was drunk; witness was present and with the prisoner at the time deceased invited the Union Scott Whigs in to drink; witness and prisoner were standing or sitting together, at the time, in talking distance, when deceased gave in the invitation mentioned; prisoner remarked to witness, "Do you hear that?" or can you stand that, and asked witness to go in and call out some Democratic liquor; witness told him no—and witness thinks prisoner remarked, if witness did not do it, he, prisoner, would; prisoner used no abusive language or made any threats, in witness's presence, against the deceased; witness thinks prisoner and witness remained together some ten or fifteen minutes, at that time.

Henry Harrison.   Witness lives some two hundred and fifty or three hundred yards from Bumbletown; was at Bumbletown the night after the killing—the noise of the people that remained at Bumbletown and screams of Mrs. Lee, was what carried witness back to Bumbletown that night; witness saw Green B. Lee lying dead; prisoner was in the yard standing up, and witness found W. King guarding prisoner; witness did not think Wiley King drunk; this, witness supposes, was a half or three quarters of an hour after the killing; witness conversed with Wiley King and noticed him particularly, and witness did not look on him as a drunken man; witness saw and talked some few words with prisoner that night; witness did not look on prisoner as being very drunk, though he was

in liquor; witness saw and talked some with prisoner next morning; witness thought him about the same as the night before—did not regard him as being very drunk, but in liquor some; witness thought, from the conversation he had with prisoner, that prisoner had his ordinary faculties of memory and reason; witness thought prisoner talked like he knew what he was doing; witness has known prisoner some twenty years— knew him well; witness has known some little of prisoner's general character; when drinking, of late years, from witness's knowledge of prisoner, witness thinks prisoner was a little inclined to be a dangerous man when in liquor. Witness says that for the last four years prisoner has had the character of being a dangerous man when in liquor. When witness left Bumbletown and returned that night, witness looked on Clem Clements as being pretty far along in liquor—tolerable drunk. Witness talked with Clements, he seemed to be tolerable rational, talked as though he knew something of what was going on about.

After the Court had charged the Jury and they were about retiring, Counsel for prisoner asked the Court to charge the law as to confessions; whereupon, the Court instructed them that confessions were permitted, by the Court, to go before the Jury as any other evidence; and although the Court might allow them to go to the Jury, yet, they should weigh them as they did other testimony; and the rule of law was, that any confession made under the "influence of hope or fear, was no evidence, whatever, and they should disregard it entirely; but if they should believe that the prisoner made confessions without any such influence operating upon him, and did so freely and voluntarily, then such confessions was the highest kind of evidence against him;" and to which Counsel for the defendant did not then, but now excepts.

The cause being closed, the Jury returned the following verdict, to-wit: We, the Jury, find the prisoner, Jacob Mercer, guilty of wilful murder.

Whereupon, the defendant, by his Counsel, moved for a new trial, on the following grounds, to-wit:

1st. That the finding of the Jury was contrary to the evidence submitted in the case.

2d. That the finding of the Jury was contrary to the charge of the Court.

3d. That the finding of the Jury is contrary to the law.

4th. That one of the Jury who sat upon and tried said case, to-wit: Richard F. Bostwick, had formed and expressed an opinion as to the guilt of said defendant, and had said, previous to the trial of said case, that said defendant ought to and would be hung, as will fully appear by reference to the affidavits hereto annexed.

5th. That Richard F. Bostwick, one of the Jurors, was not willing to said verdict, but consented to it because the majority was against him, and he could do nothing from the fact of a majority of the Jury being against him, and that the questions propounded to the Jurors, when put upon their *voir dire*, was contrary to law.

The following affidavits were introduced in support of said motion for a new trial, to-wit:

GEORGIA—STEWART COUNTY:

Before me personally came Elisha Woodard, who being duly sworn, deposeth and saith on oath that some time since, about a month or two ago, he was in the grocery store of Richard F. Bostwick; that said Bostwick and some other persons were talking about the circumstances of the murder of Green B. Lee by Jacob Mercer; that said Bostwick replied (alluding to the circumstances of the murder as then stated) that said Mercer ought to be hung.                              E. WOODARD.

Sworn to and subscribed before me, this Oct. 26th, 1854,

C. J. WALKER, J. I. C.

GEORGIA—STEWART COUNTY:

Before me personally came James Jones, who being duly sworn, deposeth and saith on oath, that after the impannelling of the Jury in the case of The State *vs.* Jacob Mercer, that he mentioned to Burwell R. Harrison, one of the State's Attor-

neys, that he had selected a bad Juror in the person of Richard F. Bostwick, for that he thought said Bostwick would never return a verdict of guilty; that said Harrison replied that he, Bostwick, would hang him, for he had heard him, Bostwick, say that he, Mercer, would, or ought to be hung.

JAMES JONES.

Sworn to and subscribed before me this October 26th, 1854. C. J. WALKER, J. I. C.

GEORGIA—STEWART COUNTY:

Personally came Jacob Mercer, who being duly sworn, deposeth and saith, that upon the trial of the case of The State *vs.* Jacob Mercer, that he had never heard of the expression of any opinion by Richard F. Bostwick, one of the Jury who tried said case, as to his guilt or innocence, and that he did not know that said Richard F. Bostwick had said that deponent ought to and would be hung.

JACOB MERCER.

Sworn to and subscribed before me this October 26th, 1854. C. J. WALKER, J. I. C.

The State's Counsel then introduced B. R. Harrison, Esq. one of the Attorneys for the State, and he testified that it was true he had heard R. F. Bostwick express opinions unfavorable to prisoner. The Solicitor General then introduced John A. Tucker, C. A. Evans and E. H. Beall, Esqrs. Attorneys for defendant, who each testified that they had never heard said Bostwick express any opinion as to the guilt or innocence of the prisoner.

The Solicitor then introduced Thomas H. Morton, one of the Jurors who tried the case, to prove that Rich. F. Bostwick was one of the last who agreed to the verdict; and said Morton testified that said Bostwick did not agree to the verdict at all, but said he could not do any thing, as they were all against him.

The defendant's Counsel then introduced the following affidavit, to-wit:

GEORGIA—STEWART COUNTY:

Before me personally came Marion J. Jenkins, who being duly sworn, saith that this morning, (next after the trial of Jacob Mercer for murder) Richard Harrison, one of the Jurors who tried said case, told deponent that he did not believe Mercer ought to have been convicted, and that he, said Harrison, would not have agreed to the verdict but for the fact that they were all against him; and Richard F. Bostwick and they could not do any thing *by themselves.*

MARION J. JENKINS.

Sworn to and subscribed before me this October 26th, 1854.
C. J. WALKER, J. I. C.

And the defendant's Counsel then introduced the statements of E. H. Beall, Calvin J. Walker and John A. Tucker, Attorneys in the case, who each stated in his place that Richard Harrison had told them that he did not agree to the verdict, but suffered it to be so brought in, because he could not control the rest of the Jury.

When the Jury returned their verdict, they were polled, and each agreed to the verdict.

Upon these exceptions error is assigned.

J. JOHNSON; TUCKER & BEALL, for plaintiff in error.

RAMSEY, HARRISON and B. F. WORRILL, for defendant in error.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] When the Jurors were called up in this case, they were asked by the Solicitor General "if they had any conscientious scruples as to capital punishment," this offence having been committed before the Act of the last General Assembly, authorizing such questions. No objection was made, at the time, by the prisoner's Counsel, and no decision on the point was asked for, or made by the Court. He may have supposed, and

he had the right to suppose, that the questions were put by an understanding between the counsel, and that all objections were waived. We think, therefore, that in this proceeding the Court committed no error by not interposing, supposing that the questions were not authorized by law to be put in this case.

But we are not sure of this. We rather incline to think that the provisions of this Act, merely regulating the form of trial as they do, apply to all trials taking place after the passage of the Act, whether the offence was committed before or not.

[2.] In the course of his charge, Judge CRAWFORD remarked, that confessions were the "highest kind of evidence;" and of this, complaint is made. It is insisted that confessions *may* not be the highest kind of evidence; that they may be made under such circumstances as tend to involve them in doubt or suspicion. And that the charge of the Court was calculated to lead the minds of the Jury away from the inquiry, whether or not any such circumstances existed in this case; whether or not the confessions of this prisoner may not have been made while he was in a state of mind and body which lessened the value of his admissions, and rendered them not the highest kind of evidence.

That justice may be done to the charge on this head, we should look to the circumstances under which it was given. The charge had been concluded, and the Jury were about to retire when the Counsel for prisoner arose and asked the Court to "charge the Jury as to confessions." Thereupon, the Court instructed the Jury, that "confessions were permitted to go before the Jury, and although permitted so to go, yet they should weigh them as they did other testimony; and the rule of law was, that any confession made under the influence of hope or fear, was no evidence whatever, and they should disregard it entirely; but if they should believe that the prisoner made confessions without any such influence upon him, and did so,

freely and voluntarily, then such confessions were the highest. kind of evidence against him."

It will be observed that the Court was thus requested, in general terms, to charge the Jury "as to confessions," and gave in charge the general and elementary principles which govern the subject. In a general point of view, all that was charged was correct, and if there were any special circumstances in the evidence, which took this case out of the general rule, to these the attention of the Court should have been called. In the absence of this, and looking to the *generality* of the request, the Court may have rightly presumed that only the general instruction was desired. But [perhaps it may be said, that if the charge be examined closely, enough was contained in it to direct the attention of the Jury to any circumstances which might lessen the value of the confessions as evidence; for we find the Court, while telling the Jury, that *if the confessions, &c. were freely and voluntarily given, they were the highest kind of evidence;* at the same time saying, that *they should be weighed by them as any other testimony.*

After verdict in this case, a motion was made for a new trial, and over-ruled by the Court on all the grounds taken. And this decision is before us, alleged to be erroneous, because —1. The verdict was contrary to the evidence. 2. To the charge of the Court. 3. Because it was contrary to law.

[3.] A very forcible criticism has been made upon the character of this testimony, and we have felt the weight of it. It is alleged that most, if not all the witnesses who were present at this homicide, were in a state of beastly intoxication, and very unfit, properly to take cognizance of, or to report what transpired.

This is partly true. But though true, there are several circumstances not depending on the statements of the drunken witnesses, (we speak not now of the admissions made by the prisoner,) which authorize a strong suspicion that the decedent came to his death at the hands of the prisoner. Yet these were not entirely satisfactory; and hence, during a part of the considerable time which we have had this case under advisement,

we have hesitated to say that this prisoner should be deprived of his life upon such testimony.  Not that it was *all* the testimony of drunken witnesses; but that a *very large portion* of that which was material, was so.  And not that we were prepared to say, that any other verdict could have been rendered on this evidence; but that we felt, as Judges, that the responsibility of depriving our fellow-man of life, upon such testimony, was very great; and that in consideration of the circumstances, as no witness had seen the mortal blows given, and the evidence, upon which reliance was chiefly had, as we thought, for a conviction, was circumstantial, the sentence might have been commuted to perpetual imprisonment in the penitentiary.  And a majority of this Court were inclined to send the case back with instructions to this effect.

Upon looking more narrowly into the testimony, however, we have become satisfied, that there is evidence of the prisoner's guilt, which is not circumstantial—evidence consisting of confessions made by him, and deposed to, in part, by witnesses who were not intoxicated, and whose testimony is not impeached.

We find James H. Jackson saying, that the father of Green B. Lee (the decedent) came up, after the homicide had been committed, and said, that the prisoner had killed his son, " and should hang," when "prisoner spoke very low, and said, he had done nothing more than he wanted to do, and he did not care if they hung him, or what they did with him."

Mrs. Mary Ellis, a witness who was not one of those who were said to have been more or less intoxicated, says that she went to the place where the homicide was committed, on the night decedent was killed, with Mrs. Mercer (prisoner's wife) and her children—"heard prisoner say he did kill Green B. Lee, and would do it if it was to do again."

Samuel Wright said, that " on the morning after the killing of Green B. Lee, was at B—asked prisoner how he felt. Prisoner answered he would feel better if he had some coffee. W. then asked prisoner how he felt about the scrimmage or fracas of the over night, or what he had done: his answer was,

'Sam, I have done nothing more than I expected I would do four years ago'."

Charles T. Connally (a witness of whose high character for respectability the eloquent Counsel for the prisoner speaks) says, that he "was called twice by prisoner to come to him. He then went. As he was approaching, prisoner says, 'Connally, I am in strings'. Witness replied, 'I see you are; I am sorry for it'. Witness then asked, 'how came you to kill Lee, or what caused you to do it?'" [Did the prisoner deny it, or prevaricate, or speak doubtingly, like one who had committed the act in a dream of madness? Let us see.] "His reply was, 'I can't tell you now what caused me to do it.'" [We might conjecture that this arose from his not recollecting. But mark what follows:] "I then asked if they were in a row or difficulty that caused him to kill him. Prisoner replied, 'no; there had not a word passed between us.' He then went on to remark—'It is done as you see it *there*,' (this was next morning, in view of the decedent) 'but I cannot tell you, now, what caused me *to do it*. *I will acknowledge the whole truth* to the Court.'"

Samuel J. Johnson, a witness for the defendant, swears that "at commitment trial, he asked prisoner what he killed Green B. Lee for. Prisoner answered he did not know, for he had nothing against him."

In view of these confessions, and taking them in connection with all the other testimony, we have felt constrained to say that the verdict of the Jury was supported by the evidence; and that we see no reason, because of the intoxicated condition in which some of the witnesses were, to disturb the judgment in this case.

[4.] It was argued that the verdict was contrary to law, because that this prisoner was overcome with liquor, until (as it was insisted the testimony shows) he knew not what he was doing, if he did take the life of the decedent; that he had no malice against him (who was his brother-in-law) but that he struck the mortal blows in irresponsible madness.

To this appeal, we oppose the law of the land—the law which

declares, that voluntary drunkenness "shall not be an excuse for any crime." To it we oppose more than this; we present reason, plain policy, and the facts of this sad case. Let us glance at these facts for a moment.

On the 12th day of November, 1853, there was a militia muster at a place called Bumbletown, in Stewart County. Many persons were assembled, and among them one or more candidates for public office. Out of this circumstance, perhaps, grew some electioneering and political excitement after the muster. Not a little strong drink, too, was consumed upon the occasion, and the decedent, who seems to have been a leading man at the place, called upon his party friends to drink with him; when the prisoner, who thought the brother-in-law of the decedent, was opposed to him in politics, expressed some exasperation, and proposed that a candidate of the opposite party who was present, should also call for drink. As night approached, most of the company dispersed; but some remained, apparently for the purpose of prolonging the debauch at one of those sinks of iniquity and sources of crime—a grog-shop—for that particular place made and provided. Here these persons, among them the decedent and the prisoner, assembled, and all continued to ply themselves with the vile drink there retailed—a drink as "thick and slab" with poisonous and inflaming ingredients, (according to the description given by the Counsel for the prisoner,) as was ever the disgusting liquid in a witch's cauldron; until every man, including even the dispenser of the mischief-working fluid, (fit minister for such an altar) the keeper of the shop himself, had become more or less intoxicated. Then it was, when the night had considerably advanced, that a quarrel arose, (as is of course always to be expected on such occasions,) between some of those present. The decedent still giving vent to something like political excitement, knocked down one of the company, of whom he spoke as obnoxious to him from this cause, and thrust him from the house. The next thing stated is, that the prisoner, (very probably espousing the cause of his political friend,) is seen in contact with the decedent, with a bloody knife in his hands—his face and

hands dripping with blood; and presently afterwards, the decedent is found dead, covered with several ghastly wounds. Subsequently, the prisoner throws his knife into the bushes, according to the evidence. It is found and indentified as a knife which he had previously owned. And afterwards, he confesses to several persons that he had taken the life of the decedent.

We shall not continue this reference to the testimony. Our only object has been, by this slight *resume* to show, that going upon the supposition that the decedent was slain by the prisoner, there is nothing in the evidence, (such as is contended for by his Counsel) the effect of which is to show an excuse in his drunken madness. He voluntarily placed himself in this situation, even if he were thus drunk, and if he continued to inflame himself with liquor until he had reached such a pitch of fiendish phrenzy, that without any cause which can be assigned, unless it be mere political 'excitement, he could imbrue his hands in his brother's blood, there' can be no excuse for such voluntary madness—there can and should be no excuse for it; because it shows a heart fatally bent on mischief, and desperately at enmity with mankind. If it should be excused, what good and peaceable citizen is safe, who may chance to come in contact with the reckless ruffian in his cups, or the drunken debauchee fresh from his midnight revel?

There is, in the evidence, a statement by an unimpeached witness, (Henry Harrison) who says that he has known prisoner for twenty years, and that for "the last four years he has had the character of being a dangerous man when in liquor." If this be so, there is the more reason why he should be held responsible for such an act, committed in a state of voluntary drunkenness.

[5.] One of the assignments of error in this case is, that the Court refused a new trial on the ground that Richard F. Bostwick, a Juror who tried this prisoner, had before the trial formed and expressed an opinion as to the guilt of the prisoner, viz: had said that " he ought to be, and would be hung."

The record shows, that the " said Bostwick and some other

persons were talking about the circumstances of the murder," &c. that a statement was made in relation thereto by some one present, and "that said Bostwick replied, if such were so, that said Mercer ought "to be hung." Bostick was not put upon his *voir dire.* And as the Court below decided, the statement showed that he had no fixed opinion on the subject, or prejudice against the prisoner, but the remark was a mere loose observation founded on the unsworn statement then made in his presence ; and indeed, was cautiously guarded, for he said, "if that were so," &c. The presumption is, from the record, that such an impression would have yielded to evidence delivered under oath, and that triors would so have found, had he been put upon triors.

[6.] It is also urged that the Court should have granted a new trial, because Richard Harrison, one of the Jury who tried the prisoner, had informed several persons, whose statements appear in the record, that "he did not agree to the verdict, but suffered it to be brought in, because he could not control the rest of the Jury."

In the first place, this assertion of the Juror is not sustained by the record. That shows he did agree to the verdict, in the way which is known to the law. In the next place, a Juror cannot be allowed, in this way, to impeach his verdict. The practice is too plainly improper and dangerous, to need any further comment from us.

It is our solemn duty to affirm this judgment.