Westmoreland *vs.* The State of Georgia.

agreed price of the ware, and the Court ought to have allowed the jury to pass upon the proof.

Judgment reversed.

HARRISON WESTMORELAND, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. An opinion formed and expressed from hearsay as to the guilt of the accused does not disqualify a juror from trying the case.

2. It is no ground for challenge to the array that some of the jurors were summoned by a bailiff, in attendance upon the Court and under its direction, unless the defendant shows that he is in some way prejudiced thereby.

3. That a witness did not hear all of a conversation of defendant about which he is called to testify, is no ground of objection to his stating so much of it as he did hear.

4. The defendant cannot give in evidence his own sayings as to when a certain injury was inflicted upon him, and who inflicted it, made to his physician two or three days after the perpetration of the act for which he is indicted.

5. It is not error in the Court to refuse to charge the jury that if they have a reasonable doubt as to the sanity of the prisoner, they should acquit, where he charges them, "If, after a careful survey of all the testimony, you have a reasonable doubt of the defendant's guilt, you will acquit him."

6. A juror's affidavit will not be received to impeach his own verdict.

7. Mere information to a jury that a bet has been made by a named person as to the result of their verdict, without more, is no ground for setting the verdict aside.

8. Misconduct on the part of the jury, while they have the case under consideration, from which injury might have resulted to the defendant, throws the burden upon the State to show affirmatively that no such injury has resulted. In this case, the State has done so.

9. The verdict, in this case, is not contrary to law nor the evidence; neither is the charge of the Court inapplicable to the facts.

Criminal Law.  Jurors.  Evidence.  Insanity.  Tried before Judge HOPKINS.  Fulton Superior Court.  April Term, 1871.

Westmoreland was charged with an assault with intent to murder C. L. Redwine, by shooting him with a gun. He pleaded not guilty. While the jury was being impanneled a person was presented, and, upon examination, answered as follows: Question. "Have you, from having seen the crime committed, or having heard any of the testimony delivered upon oath, formed and expressed any opinion as to the guilt or innocence of the person at the bar?" Answer. "No; but I have formed and expressed an opinion from rumor." Question. "Have you any prejudice or bias resting on your mind either for or against the prisoner at the bar?" Answer. "No." Question. "Is your mind perfectly impartial between the State and the accused?" Answer. "It is." Question. "Are you conscientiously opposed to capital punishment?" Answer. "No." The State put him upon the prisoner. The prisoner's counsel objected to him because he had formed and expressed an opinion as to his guilt or innocence from rumor. The Court "put such questions to him as to enable the Court to understand the state of his mind." He was asked if he could discard the rumor and do equal and impartial justice between the State and the accused, and he answered that he could. And the Court "being well satisfied of the truth of his answers to those questions," (including the statutory questions) pronounced him competent. He was challenged by the prisoner; but the jury was made up without prisoner having exhausted his challenges allowed by law.

The first pannel of jurors being exhausted before a jury was made up, a new pannel was summoned and put upon the prisoner. His counsel challenged the array, and moved to set that pannel aside because it had been summoned by a bailiff, and not by the sheriff or his deputy. The motion was overruled.

The frequency of such defenses, and the importance of the principles justify an extended report of the evidence.

To understand the evidence, it is proper to remark that Whitehall street, running north and south, is crossed at right

Westmoreland *vs.* The State of Georgia.

angles by Alabama street.  Redwine & Fox's drug store is on the southeast corner of said streets, and diagonally across is Lynch's corner, occupied then as a book store.  Each of these streets is about sixty feet wide.  To reach the Constitution office from said drug store, the route is up Alabama street, and that office was on Broad street, north of Alabama street.  Redwine's boarding house was on Pryor street, and to reach it from the store, the direct route was up Alabama street, on its south side.

Howell testified that he and Redwine, after dark, about 7 o'clock P. M., in December, started to a collation at the Constitution office.  They went diagonally across from the drug store towards Lynch's corner; in going they were talking, and Redwine had his hands in his pockets, with his thumbs out, and Howell had his arm.  As Redwine stepped upon the sidewalk of Alabama street, some ten or twelve feet west of Lynch's corner, some one hallooed "look out!"  Howell turned, and Redwine turned his head, and immediately a gun fired.  Redwine put his hand to his side with an exclamation, and bending over, walked back to his store rather briskly.  Howell walked to Lynch's corner, where the gun was fired, and saw Westmoreland standing with a double-barreled shot-gun cocked.  When he fired it it was all exposed but the butt of the gun which was under his talma.  Howell rushed into the side-door of the store at Lynch's corner, and said that Westmoreland had shot Redwine, and when he came out again several persons were talking with Westmoreland, and he said something about his gun havin g twelve buckshot in it, but witness did not hear all he said then.  Westmoreland had on a talma, and though a gas-lamp was burning on the opposite corner, and inside the store at Lynch's corner, Howell did not recognize Westmoreland till he shot.  He remembered seeing a man at Lynch's corner, and thinks it was light enough for him to have seen his gun had it been exposed, but he did not see the gun till he fired.  When Westmoreland fired he was about twenty-five or thirty feet from

Redwine. Howell went to the store to look after Redwine, and finding him in the hands of physicians, he returned to Lynch's corner. Finding that Westmoreland had been carried to the calaboose Howell went there. Wise and two or three policemen were there, and Westmoreland was in a cell, alone. Westmoreland was talking about the occurrence when Howell arrived. Howell remembers only two of the remarks made by him. Westmoreland said "he had walked over this matter as long as he could." The cell door was then opened and Howell asked Wise to ask Westmoreland if he knew who was with Redwine when the gun was fired. Westmoreland replied that he did not know who the person was, but that he gave him notice to get out of the way. Howell said he did not remember all that was said, but he heard all that Westmoreland said while he, Howell, was there. When the door opened Westmoreland was crying. Howell said he had known Westmoreland fifteen years; that he frequently saw him at said drug store when he thought by his conversation that he was drinking; he never saw him stagger, nor guilty of any disorderly conduct at such times; he was usually very quiet. (Because Howell did not hear all Westmoreland said defendant's counsel moved to rule out what he did hear. The motion was overruled.)

Dr. Redwine testified as follows: A week or two before the shooting he treated Westmoreland with some indifference because he was in the store drunk. On the day before the shooting, Westmoreland was in the back part of the store, standing by the stove, with a knife in one hand and a cane in the other, cursing and making a noise, so that Redwine heard him in the front of the store. He supposed he was cursing Dr. Branham, who was standing with him. Redwine walked to Westmoreland and said, "we have put up with this profanity as long as we canst and it;" said to Westmoreland that he had become a nuisance to the store, and that he must go out and stay out till he could keep sober and behave himself. Redwine took him by the arm and led him

unresisting toward the front door. Westmoreland stopped and said, " Is this your style?" and Redwine replied that he wished him to go out of the store, and stay out. As Westmoreland got out of the front door, and Redwine was standing in it, Westmoreland struck him with the cane, "about as large as one's thumb." It struck Redwine's uplifted arm and broke; Redwine got one piece of it, about eighteen inches long, of the large and crooked end, and Westmoreland retained the other ; Westmoreland threw his part of the stick at Redwine, which he dodged, and struck Westmoreland over the head with the piece which he had. Westmoreland's flelt hat was not knocked off by the blow. Redwine said to him then that he was an old man, and that he did not wish to hurt him, and wished no difficulty with him. Westmoreland walked off a few steps, and turning, said, " God damn you ! hell awaits you;" and walking a few steps further stopped and repeated those words or some like them. Redwine denied kicking him, or at him. That was about three or or four o'clock P. M., and Redwine saw no more of him till he was shot by him the next night, about his usual supper hour, seven o'clock P. M.

He then stated the leaving of his store, etc., substantially as Howell did. He said his wound from the shot was on his right arm and in his right side, between the seventh and eighth ribs, below and behind the right nipple. One shot passed through his arm and below the elbow, and one cut the skin above the elbow. He said he was over a month unable to turn, and two months confined to his room, from said wound in his side. He said Westmoreland was habitually at their store, and knew his route to supper, and his usual time of going. He said Westmoreland was habitually drunk and profane ; that he had never ordered Westmoreland from his store before, but Fox had ; that he (witness) had before asked him to desist from cursing, and sometimes he did. Westmoreland never staggered from liquor ; sometimes his gait was unsteady. Redwine never saw him

too drunk to keep him from recognizing persons, and know what he was doing; he practiced medicine, and had his prescriptions carefully prepared, and knew well what prescriptions were proper. He said that the prescriptions were not usually put up by himself (Redwine), but by his partner and clerks. He considered Westmoreland as a friend to the store; he had had his headquarters there, and paid for all the medicines he bought. Sometimes Westmoreland bought opium and morphine. He testified as to the effects of liquor and opium on the mind, which see hereafter, under insanity. For convenience of reference, all the evidence as to insanity is grouped together.

Dr. Crawford, Redwine's physician, described the wound and said that the shot taken from it were buck-shot.

A witness testified that, as he went to supper that night, he met Westmoreland, about two squares south of Redwine & Fox's store, going up Whitehall Street, towards said store, and away from his home. He had a gun in his hand; they did not speak to each other at the time. Afterwards, say in half an hour, he heard of the shooting.

Mr. Woodding testified that, on the night of the shooting, he heard many things said by Westmoreland, in the guardhouse. The only one remembered distinctly was Westmoreland said he had shot the G—d d—d s—n of a b—h, and that if he did not kill him it was not his (Westmoreland's) fault; said he was not sorry for the shooting, but sorry that he had to do it. This was about an hour or an hour and a half after the shooting; and Westmoreland talked on, in that way, for about an hour. Witness was then in charge of the prison, and was till about 10 o'clock P. M. Westmoreland seemed to be drinking, and talked all the while, repeating his conversation whenever any one came in. Sometimes Westmoreland cried; he slept some time. Some one gave him some liquor. Witness frequently saw Westmoreland when intoxicated, as he supposed; but he never staggered, would walk, stop awhile, and then walk again, as if deliberating;

but never saw him walk except in a slow, measured pace; never saw him misbehave.

The bailiff who took him to the guard-house said, that when he arrested Westmoreland, he gave up his gun, and went willingly, talked all the way, telling how his gun was loaded, and saying he would have used the other barrel if it had been necessary.

Mr. Blanchard swore that he saw Westmoreland as he came out of the door of the drug store, and gave the same account of what was then and there done, as Dr. Redwine gave, except he said Westmoreland seemed to him to have been pushed out of the door, and that the blows struck were insufficient to have staggered a ten year old child. Here the evidence for the State closed.

### EVIDENCE FOR THE DEFENSE.

It was shown that Westmoreland habitually used intoxicating liquors and opium. It was contended that his head was injured by Redwine when he struck him and the defense was directed to showing the effect of these things on his mind.

On cross-examination, Dr. Redwine had testified as follows: "The effect of long continued use of morphine and liquor on the mind would depend upon the quantity of each taken. It might impair the mind to some extent; in other cases it would not have that effect, but only stupify the mind. I have known some to take it for several years without that effect. If a person accustomed to their use received a severe blow on the head, it is probable that inflammation would be excited readily. I do not believe that a slight blow on the head of such a person would have a greater effect than on one not so accustomed to use opium, unless there was a contusion or abrasion of the skin, then it might produce inflammation sooner. If inflammation of the brain ensued that would affect the mind; that is the internal result of inflammation on the brain. Morphine has a tendency to quiet the brain and to produce stupor. Intoxicating drinks gen-

erally excite the brain; opium and morphine have a soothing effect, and if taken in excess they stupify the system. The effect of long continued use of opium and morphine on the mind depends on the quantity taken and the constitution of the person using it. No regular rule can be laid down. If taken constantly and excessively it produces a kind of stupor. If kept up for years it would affect the mind and brain in many cases. The use of liquor added to morphine and opium might have the same or similar effects; that depends upon the quantity, constitution and length of time. It affects all persons more or less; does not always impair the mind particularly.

*Redirect:* I cannot say that the joint action of alcohol and morphine would balance each other. If he took both simultaneously it would likely increase the excitement. I never saw the least evidence that Westmoreland's mind was not as clear as mine, or any other man's; his prescriptions were clear and his conduct as a physician was as good as anybody's; his mind was not affected except when directly under the influence of opium or liquor. When the effect passes away the mind is clear.

*Re-cross:* There is no difference in the effect on a sober man or a drunken man, if the skull was fractured; unless there is some contusion or fracture of the skull. A blow upon the head might affect the brain without breaking the skull, if it produced concussion of the brain; but it would not probably produce concussion without fracture—it is possible. When one is intoxicated he is excited, but there is no other change in his mind. That the seat of reason is in the brain, is the accepted theory of medical science; there is no organic change in the brain when under the influence of liquor; a drunk man does not exercise his reason as when he is sober, but a drunk man is not insane.

Dr. Roach testified as follows: Dr. Calhoun was attending upon Westmoreland in the jail; about two weeks after the shooting, witness examined Westmoreland's head, and

found an injury on its left side, near the top; at some time he had received an injury on the cranium, caused probably by a direct blow by some hard substance; in witness' opinion that blow produced a fracture of the external table of the skull—the depression is there yet; the brain is still below the inner table of the skull; the inner table will not resist force as well as the outer one—it is more flexible and porous. Westmoreland was complaining of his head when witness examined him. If a drunkard receive a blow upon his head, when reaction came on the inflammatory stage would be greater and longer than in a sober man; he would be more liable to inflammation of the brain. Westmoreland is about fifty-four years old; I have known him fifteen or sixteen years as a physician; he has been intemperate since the war; have seen him frequently under the influence of liquor; before the war he was not only intelligent, but of good morals and respectable; since then he has drunk to great excess, and used morphine and opium habitually, and has been very poor.

*Cross-examined:* That wound on Westmoreland's head was made at least twelve months before witness examined it; it may have been there longer; it bore no evidence of having been made at any time recently before my examination; it was old—of long standing—had gotten well. The effect of a blow on the head is not changed by the stricken one being drunk or sober; the effect on his mind would be the same in either case; if one is struck and walks off, that is evidence that there is no concussion; he may, however, have concussion afterwards, as the result of internal hemorrhage; unless the blow is heavy enough to produce concussion it cannot produce internal hemorrhage. I never took Westmoreland to be an insane man; he was always able to transact business, and had no symptoms of insanity. I know not as to the tendency of opium eating to produce insanity; I have known persons to use it seventeen years who are sane; I wont say it might not make one insane; it is possible that liquor might produce insanity, but I never knew an instance of the kind. I

do not know that opium and liquor combined have a tendency to produce insanity.

H. Muhlenbrink, a grocery keeper, testified that he did not believe Westmoreland was of sound mind; that he drank at his grocery every day; would, when under the influence of liquor, sing vulgar and indecent song, quote Latin and Greek, call for tigers, wolves, hyenas and the like, and did not seem to him to be rational. He said he never saw him take morphine, but he thought that he was worse about six weeks before he shot Redwine.

Kramer, a druggist, said he knew Westmoreland to use morphine every day for several months, in the summer of 1869, and that he habitually used liquor also; that while he could not say he was insane, he believed his mind was impaired thereby. He lived in same house with Westmoreland in summer of 1869, and he would come in quarrelling with imaginary persons, who had insulted him and call for his gun. His wife kept the gun hid. Once about dusk, in such a case, his wife hid his hat. He took her sun-down and shawl and his gun, and went out and staid till about eleven o'clock, and when witness asked where he had been, and he said he had been trying to kill a dog.

Dr. Calhoun testified as follows: Have been practicing in the jail six years. When Westmoreland was put in, shortly after the shooting, he had his attention called to a depression in his skull, about as long as his little finger and about as deep as a third of said finger. Would have examined it further, but Westmoreland flinched and said it was extremely painful and so I made partial examination. It seemed to be very sore. I had no reason to believe it was recent, except the flinching, etc., aforesaid. It must have been inflicted by a hard round substance, like a stick.

He was asked what Westmoreland said about the wound when he was examining it, and as to who inflicted it, and when; but, upon objection made, the Court would not allow the question answered.

He said : I know Westmoreland was almost always under influence of liquor or some narcotic. Long continued excessive use of them has a dementing effect like old age, occasioning loss of memory, thought, reason and judgment. If one were really insane, he would show it when sober, but more when under influence of liquor. There is a very material difference between *dementia* from alcoholic drinks and from old age. Have seen Westmoreland under influence of liquor ; he was more or less insane. Insanity includes various degrees. I mean by insanity anything that renders the mind unsound temporarily. When a man has a high fever he is not insane, (some men are); if it is high enough to produce delirium he is not sane. If one drink of liquor is sufficient to produce drunkenness he is not sane. When one is under a violent passion, for the time being, he is not so rational as when cool. The term insane includes every feature of unsound mind. There is a slight degree of insanity called a crack in the head; the Scotch call it a "beé in the hat." When free from alcoholic drinks, Westmoreland could distinguish between right and wrong. He was in a demented condition when he came to the jail. I thought he might have *delirium tremens,* and treated him to avoid that. When free from liquor and narcotics, he was rational and as ordinary men. To avoid *delirium tremens,* I restored him to what I considered a sound condition of mind.

S. Downs, a liquor seller, testified that Westmoreland habitually used liquor and morphine; that when drinking, he used profane language and indecent expressions, and he, Downs, believed that his mind had been impaired by their use. He said he knew, by experience, what he talked of, for he had been so drunk that as not to know what he talked about or did, and said "that is what I mean by insanity."

James Loyd testified as follows : He was in the book store when Westmoreland shot; when he and others ran out Westmoreland was standing, gun in hand, and said, " boys ! didn't she crack?" meaning his gun. He "went on a good deal,"

speaking of shooting Dr. Redwine; said, "if that did not kill him, I have twelve more buckshot that would kill him." I thought no sane man would so speak and act. I was of the party which took him to the calaboose. There he would sometimes talk, laugh some, cry and curse, and "go on" before he had liquor there, say three-quarters of an hour after the shooting. I had not seen Westmoreland drunk that day. He acted as if "not right, drunk or something." I thought he was drunk; he acted like a drunken man, and I suppose he was drunk. He said once in three or four years, he saw Westmoreland take some opium from his pocket and bite off a piece.

Judge Hayden testified that he had seen Westmoreland take from his vest pocket something in a paper and bite, say a half dozen times, and he supposed it to be opium. I thought he was killing himself by using opium. Do not believe his mind was impaired, and have no idea that he did not know that it was wrong to shoot a man—one must be pretty far gone for that; but I saw no indications of want of sound mind in him.

Jentzen, a liquor seller, said he had sold Westmoreland liquor almost daily for years, and that he drank to great excess; also that he carried morphine in his vest pocket and frequently drank it in liquor or water. He said Westmoreland would sometimes sit down and say nothing; then, all at once, would begin to sing a song; then he would curse and knock his cane on the floor. Usually witness advised him to be quiet, to go home. Sometimes he would sit down and be quiet awhile, and then jump up and behave as before, without any one speaking to him. He never saw any drunk man behave as Westmoreland did.

A. Gaines Chisolm knew Westmoreland as a free-drinker; never saw him use opium. Was with Loyd when the shooting occurred, and heard Westmoreland, speaking of his gun, say, "Did she not pop?" or "Did she not crack?" Saw him at calaboose in an hour or an hour and a half after that; he

talked, cried and cursed, talking at random about the difficulty and cursing; don't remember anything he said. We took the whisky to the calaboose for him.

Griffin, a crocery keeper, testified that Westmoreland drank at his bar morning, night and noon and at night of each day; he was always "tight," except very early in the morning, then nervous till he got a drink. On the morning of the shooting he did not complain more than usual; on the day before he complained of his head, about four o'clock P. M.; he said he had a difficulty with Redwine, and that Redwine had struck him with a stick. He talked sensibly a good deal of the time; he was talking at random before that, a kind of foolish nonsense. I thought he talked as sensibly as common; he made no threat. He sat by the stove, seemingly in a study, and said: "Griffin! I have been badly treated," I asked how, and he said: "I have been making Redwine & Fox's house my headquarters, I have spent a good deal of money there, and Redwine kicked me out of his house like I was a brute; it has hurt me and mortified me." I have seen no evidence of a want of a sound mind in him when sober. I think some three or four times, probably a year before this difficulty, I saw him so drunk that he could not distinguish right from wrong. He was rational in the morning before drinking. He used a great deal of opium and morphine.

John McGee, another liquor seller, testified to Westmoreland's frequent drinking, and to his carrying and using morphine, and said that, when under the influence of liquor, he did not behave like a sane man; would talk to himself, talk foolishly, in a peculiar and strange manner; he did not behave like other drunken men.

Thomas Hayney said Westmoreland drank to excess; would go along the streets, swearing to himself, no person near him. I have heard him sing songs; have seen very uncalled for actions on the part of an educated man; he would use bad language, and acted in a very curious way. When singing, he would have a stick, and "kinder go round," and sing

obscene songs, half a verse, and then curse, no one inter-
rupting him.   I never saw a drunken man act in his pecu-
liar way.   At his request, witness bought some quinine for
him, since the difficulty.

Mason, a book binder, testified that Westmoreland was his
physician in 1867, and before, and had changed very much
since.   He had been habitually drunk.   He would mutter to
himself, cursing everybody, apparently, to himself; singing,
and doing everything ridiculous.   His mind was not as
sound as it had been; I thought his conduct was unusual
and remarkable; may have seen drunken men act as he did,
but did not know how they acted before.   He sung the most
vulgar songs, and used the most blasphemous language; have
seen him sit and sing, take off his shoes, and kick at them.

Smith, a liquor seller, had seen him use opium, and knew
him to drink habitually.   When under the influence of liquor
his mind seemed wrong; he would sing vulgar songs, and use
indecent language.

A. M. Perkerson, deputy sheriff, testified that once or
twice, within a year and a half, or two years last past, he
had observed that when a negro passed Westmoreland on
the streets, he would curse him to himself, as if he did not
intend the negro to hear him.

P. Huge testified that Westmoreland was not what he uesd
to be before the war; his mind not all right, all the time.
He would sit alone, sing songs; go along by himself, sing-
ing songs and talking.   Don't think he knew right from
wrong all the time.   If made mad, he was not too good to
shoot any one.   He got more restless; not so steady as he
used to be; more ready to resent any insult than he used
to be.

G. W. Anderson testified that he had known Westmore-
land for many years, particularly since the war; seldom
saw him free from the effects of liquor, and had seen him
take morphine.   Have known him to be talking on a sub-
ject, and he would break from it to another, or begin sing-

ing a song, a line or two, and swear; he was very wicked. Have heard him talk to himself and sing to himself, when no one was in the room, and when others were with him. He would go off to himself, begin talking and singing to himself, a few words; would quote poetry, or say some he had made up. I have not thought him in his right mind for several years, not all the time. At times he did not act as he used to, and I spoke of it to friends. He so behaved mostly when under the influence of liquor. Sometimes he was calm and quiet and spoke courteously.

R. J. Cowart knew Westmoreland sixteen years. He used to be a gentleman, dressed well, appeared well, and practiced medicine with success. After the war I regarded him as something of a wreck, physically and morally; he drank excessively. Up to this difficulty, I regarded him as a harmless man, always under the influence of liquor or morphine. I thought him more or less demented; never suspected he would have a difficulty. Have noticed him since the difficulty, and, if I am not mistaken, I think his mind not right; don't think he should go at large. I have thought his mind affected, since the war, but don't know to what extent. I mentioned it frequently to his friends.

R. S. Waters testified that he had known Westmoreland, many years; that he was generally drunk; had seen him conversing with gentlemen, and suddenly begin singing or cursing; he never acted so before the war; first saw him do so in 1864. Don't think he was of sound mind when drinking; have not known him to be sober in three or four years; never knew his condition, financially, before the war.

Dr. WILLIAM H. WHITE testified as follows: I am a physician all my life; I have practiced about twenty-two years. What effect has the long continuance and excessive use of ardent spirits on the brain or mind? The effect is different in different cases; in most cases the membrane covering the

brain would be thickened, a certain amount of lymph would be thrown out, the cerus membrane would be softened, throwing out a larger amount of fluid than usual, the general blood vessels would be distended, increased in size, and have a congested appearance; that, in a few words, is the general outline. The brain itself would become softened or changed in character. It would increase a man's nervousness and irritability; his brain would be more easily excited, and less under ordinary control of the nervous faculty. Insanity is a term which, by writers and others, has been differently expressed. I should term it a deranged condition of the mind, so that a person is not capable of reasoning correctly upon any or all subjects; it may be one or more. It has been subdivided into different characters — *mania, monomania, dementia,* idiocy, or imbecility. *Mania* is a general deranged condition of the entire mental faculties. *Monomania* is a derangement of one or more subjects, and correct on all others. *Dementia* is applied more particularly to old persons; that is, an entire loss of power—the power of thinking and reasoning. What is the effect of long continued and excessive use of morphine and opium, together with liquor? Very much the same as liquor alone; the symptoms are similar; the pathological condition of the brain is very much alike. Opium, in first effects, is laid down as a stimulating narcotic. There are cases of the human mind becoming impaired by alcohol and opiates. It has been my fortune to see as many as most men in ordinary practice, cases of insanity or *mania* or *monomania.* What may operate on one mind may not on another. It is very difficult to diagnose one disease of the brain from others of the brain. What effect would the long use of narcotic stimulants have on a man fifty years of age, or more, on his reason? Your question is an important one. It would have different effects on different men; that depends on the constitution, the healthy or unhealthy condition of the different organs of the body; very healthy and robust, it would take more and longer

Westmoreland *vs.* The State af Georgia.

to effect him to the same extent it would a man of les strength of constitution. There is no organ of the human body which could exist without the brain and spinal column, or nervous system; all depend entirely upon it. I propose to say no man can keep it up, for a number of years, without being afflicted with nervous disease; they will produce more or less disease. A mind thus afflicted is not as much under control as if it was not under this influence. In some men it would excite their fighting propensity; others it would make very mild. That depends upon the temperament of the man. Is one thus afflicted more liable to excitement and uncontrollable passion? If the person has a tendency that way, it would be more so; if accustomed to take spirits or opiates, his judgment would be more easily dethroned. No man who is in the habit of drinking or taking opium daily is in a natural condition. If a blow were struck on the head of a man in that condition, the concussion would be greater; a blow on the head would produce more serious consequences than on a man who was sober. Some of the signs of aberation are loss of memory, increased irritability, muttering, incoherent talking to one's self, talking first on one subject then on another, talking at random, loss of power, indisposition to do what a man in his natural condition would think. One of the marks by which insanity shows itself is melancholy. A sound mind is one that is perfect in all its actions—thinking and coming to correct conclusions on such subjects as are presented to it. These different symptoms vary with different persons—such as melancholy, walking about alone—and are not absolutely signs of a deranged mind. Some persons have a habit of talking to themselves, talking out loud. I have been engaged in the practice of my profession twenty-two years, till last August; occasionally since.

*Cross-examined.* I graduated at the University, Buffalo, New York. It was an allopathy school. The professors taught the different classes of science. It was generally con-

sidered an allopathy school. I can't say that I have prac-
ticed medicine here. I have prescribed for some. I came
here last August. Almost every writer that has treated on
insanity, speaks of talking to himself as an indication of in-
sanity. I have looked over Taylor's Medical Jurisprudence
in a hasty manner lately, within the last three days. It is
usually the case that alcoholic drinks and narcotics will pro-
duce the effects I have spoken of, but insanity is not a neces-
sary consequence; but there are cases where it has been the
result. Insanity may result from a thousand different causes;
there is no telling what may be the cause. Drunkenness af-
fects different persons in different ways. If a man has be-
come insane from alcohol or narcotics, can he then transact
his ordinary business? If the insanity has been confirmed,
or, in other words, a confirmed maniac or insane, I should
answer, he could not transact his ordinary business; but, like
all other men suffering from insanity, he may have lucid mo-
ments in which his mind acts rationally. I was going on to
say, the continued use of stimulants and narcotics increased
the circulation, the action of the heart and threw an increased
amount of blood to the brain; in other words, the great
number of capillary vessels of the brain being distended, com-
press the brain. If the stimulant was taken away, or not so
great an amount taken, there would not be as great pressure
on the brain, because the vessels would not be so full or so
large; and by thus relieving the brain from pressure, a man
might have a lucid interval. An idiot, no doubt, has lucid
intervals. Idiocy is born with the person; it is an absence
of the power of reason and thinking. The mind has lost its
power for the time being, owing to some exciting cause,
which, when removed, the mind resumes its natural condition.
The brain is all there; some exciting cause prevents its action
for the time being. It is a matter of question whether sleep
suspends its action. I think it is then in a state of rest. A
man thus afflicted has not a mind in a state of rest, in its
natural condition. The other is a pathological change, either

in the membranes or the organ itself—the pulpy substance of the brain.   As long as a man is capable of doing his ordinary business, is that a proof of his sanity?   A person may be perfectly insane on some things, and yet, on other things, be sane.   He may be generally insane.   I would not pronounce the man insane who was in the habit of drinking liquor, and yet able to perform all the ordinary duties of life, as he had been in the habit of doing before he was drunk. There have been very few examinations of the brain in the condition mentioned, because they are apt to die from some other diseases, and when it is examined, we have to take that into account.   If insanity ensued from the continued use of alcoholic drinks, would not that necessarily destroy the brain? Some it would injure, others it would injure very little.

DR. D. C. O'KEEFE testified : I am a regular licensed practicing physician.   I have practiced twenty years.   I know prisoner.   I have known him since 1860.   I have lived here and practiced medicine since 1860, except during the war. I have known prisoner since the war, I have seen him on the streets.   I had no intimacy with him.   I have met him on the streets almost every day, since the year 1866, 1867, 1868 and 1869, and to the present time.   I do not know personally of his habits—only what I have heard.   I think I have seen him when under the influence of narcotics or alcoholic drinks frequently.   I did not talk with him much—a few times, not often.   I remember of hearing of the shooting of Dr. Redwine.   I saw prisoner frequently then and after.   To what extent do the excessive and long continued use of morphine or opium affect the brain and mind? I think it is calculated to impair the mind, especially alcoholic stimulants.   The brain is the seat of the mind.   By the constant stimulating effect on the brain, keeping it in a constant state of excitement and stimulation, the brain would become diseased by its use.   I think it would be likely to produce organic disease of the brain, in a man who was habitually drunk.   I do not think the use of morphine and

opium impairs the mental faculties like alcohol does.   Taking it for years would not be likely to affect the mind.   Some of the first minds of the world, of literature and learning, have taken opium.   De Quincy, for instance, the great English writer, has had as much as half a pint of laudanum in him without apparent injury to his mind.   It is my opinion, that opium alone does not impair the mental faculties.   The constant use of alcoholic drinks would impair the mind.   I don't know that their combined use would have no effect. It would produce a condition of stupor on the brain and nervous system—the brain would be stupefied.   The brain, when in a stupor, would not be in a sound condition.   What is a mind ?   I mean a mind capable of exercising its faculties in their natural way.   The mind, under the influence of opiates, would be blunted.   The excessive use of opiates would blunt the mind.   The use of stimulants will affect a diseased mind more than a sound mind.   I think a man's mind may be impaired by the long use of alcoholic drinks.   The signs of a diseased mind are various.   Different kinds of insanity ; *monomania,* is insanity on one subject; he may be perfectly rational on all others.   It may be on religion, politics or anything else almost.   Insanity is a broad term.   It covers the whole.   I am not an expert on the subject of insanity. I only know one man in Georgia who is an expert.   He has given his study to it.   That man is Dr. Green, of Milledgeville.   He has made it his study.   I consider him a better expert than any other man in Georgia.   I judge that from his experience.   When persons become deranged, they are usually sent to the asylum, and physicians do not treat them at home.   The whole doctrine is laid down in books on medical jurisprudence.   I think Taylor's Medical Jurisprudence is considered good authority.   Idiocy is a different kind of insanity.   That is a person who lacks mind originally.   Long use of liquor may affect the mind.   A mind diseased will yield sooner to strong impressions than a sound one.   It would manifest itself by his doing unreasonable things, all

sorts of ways and things, talking unreasonably and doing unreasonable things, talking incoherently.  A frequent way of manifestation is in the dislike that insane people have to their own family; that is a frequent development.  He would dislike his wife, his father, his sister or brother, or cherished friends.  Then they take up various illusions; one man will suppose he is Jesus Christ; then almost any variety of illusions; it is manifested in different ways, in different persons.

Prisoner's position as a physician was much better before the war than it has been since.  I say this without knowing his affairs intimately.  His condition before the war was better than it is since.  Brooding over trouble is very likely to produce depression of the mind.  Some people sacrifice their lives from that cause.

*Cross-examined.*  Prisoner has looked to me as a man not of sound mind.  He had a look of stupidity about him.  If you were stupid all the time, your mind could not act. When the stupor is removed, the mind is right.  From seeing prisoner pass along, he seemed to be in this stupid condition, and not able to follow his business.  Opium might produce that effect.  Opium won't impair the mental faculties. Drinking alcoholic beverages does not necessarily impair the mind.  I have known men who drank all their lives, and were as bright as ever.  If a man can conduct his business as a physician, put up prescriptions as usual, is that not proof positive that he knows right from wrong?  I think it would be.  If he were capable of practicing his profession intelligently, he would be a sound man.  If he could diagnose disease and prescribe medicine correctly, is that not proof positive of a sound mind?  Yes, sir.  I mean to say, if a man has mind enough to diagnose disease and prescribe for it, his mind is in a good condition at the time he does that.

Dr. E. S. WITHERS testified: I am a regular practicing physician; I have practiced since 1848; I am now engaged in the practice of my profession; I am a professor in the

medical college, here. What effect would the long continued and excessive use of morphine and opium have on the
human mind and system? They have the effect of debilitating and impairing the mind, both the mental and physical faculties. The long continued and excessive use of alcoholic drinks would have a similar effect, only in a greater
degree, affecting the brain, heart, stomach—in fact, every
organ in the system. I am not familiar with the subject of
insanity, only theoretically. A party affected physically by
long use of opium and drink, impairing the physical man,
does that not necessarily affect the mind? Always, to a certain extent. Can a mind diseased or impaired resist influences, impressions, strong passions, and causes like that, as
well as a mind perfectly sound? It does not. Has a blow
on the head of a man thus influenced a greater effect than
on the head of a man not thus intemperate? Yes, sir.
Any injury would have greater effect on a person in that
condition than on a sober man. A blow on the head of a
sober man would affect him less. A recent injury would be
more sensitive, and be sorer than an old wound. Before the
entire healing of the wound, and some time after, though it
may be healed, there would be a tenderness there. There is
more sensibility in a recent wound. In some wounds the sensibility is not entirely destroyed for some time by the action
on the nerves of the part, but usually the sensation is much
more acute in a recent wound than in one inflicted some time
previous. Generally, the injury on the head of an inebriate would be more serious than on a sober person. If any
effect on an organ, the brain participates with the other organs. The recuperative powers of the system are not so
great, and the resisting power is diminished from the effect
of alcohol, in a very great degree. As a general thing, a
fracture of the skull affects the brain. I should suppose a
fracture of the skull on the top of the head, sufficient to lay
one-third of the little finger in, would affect the brain,
either temporarily, or it might be a life-time injury. That

would generally be the effect. But the evidence of the fracture of the skull is not always the same criterion of danger or injury done. I suppose a blow of the above character would affect the mind of any one, to a greater or less degree. The brain occupies the whole of the skull. I am speaking now of a healthy condition. It fills the entire cavity of the skull. I suppose the brain is about a quarter of an inch from the external part of the skull. What intervenes? We have two tables and intervening cellular arrangements between ; the outer is harder than the inner table, or the intermediate cellular substance. A blow on the outer surface might break down the intermediate substance; it would not necessarily break the inner table. I can imagine it to do so much damage, and no more. A blow that you could lay your little finger in, one-third of its depth, most probably would break down both tables, but not in all cases.

Some of the evidences of insanity are the want of power in an individual to regulate his actions and conduct, in the ordinary way, according to ordinary usage; it may be manifested in various ways: by his conversation, by his actions in regard to certain things in which, ordinarily, no man would be guilty of; then you see a want of control in regard to his actions, sometimes in many cases, then, again, only in one or a few subjects. It may be manifested by his fury or excitement; frequently, by an opposite condition, melancholy and quiet, morose condition; by excessive fear, frequently, of persons and things which, ordinarily, do not exist. There are a great variety of circumstances which show this. Expression of the countenance frequently is an index to a disordered condition of the mind. A man may be insane on one subject only; I call that *monomania*.

*Crossed:* The persons composing the faculty of the medical college are the two Drs. Westmoreland, Dr. Orme, Dr. Griffin; Dr. O'Keefe has been previously; he has been longer than I have; he is not a professor now. Suppose a wound of the character described to you, the indentation in the outer

table sufficient to lay one-third the little finger in, what would be the immediate effect? Most probably it would prostrate him, a blow of that magnitude. How long would the prostration last? That would depend on the amount of injury done to the brain; a wound of that kind may produce concussion of the brain or compression; it might destroy the power of locomotion; as a general thing, it would prevent a man going about and attending to his business; if he goes about, it is one evidence that it has been affected to a less degree, producing only very temporary confusion of the mind, to pass off in a few moments. A blow like that might affect him no more than temporarily; it would be so, if he goes about in his ordinary business. A blow of that magnitude would generally affect the mind more seriously; the power often varies, under different circumstances; he might be prostrated; that is the general effect of a wound of that severity; a blow causing a depression to cover one-third the little finger would generally affect the brain. I have met prisoner occasionally; I have only a speaking acquaintance with him.

Dr. JAS. F. ALEXANDER testified as follows: Have known prisoner twenty years. He practiced medicine before the war. He is about fifty years old; met him frequently during the last four years. He is very intemperate; drinks a great deal of whisky, and he uses morphine and opium to a great extent. Saw him almost every day, for several years, but don't think I have seen him free from the exciting or depressing effects of liquor and opium. The excessive use of them produces derangement of all the organs of the body; all are affected, more or less. I include the brain and all its surroundings. Liquor or opium, singly or combined, produces derangement of the organs, which will affect the brain. It affects the brain more than any other organ. How? The continued excitement by its stimulating effects, produces an increased action, which becomes a source of irritation; that, kept up, will finally produce a lesion of the brain, producing a degeneration of the organ itself, the structure of it. Lesion

means inflammation; or degeneration itself might be lesion. Liquor acts very powerfully on the brain; more powerfully than on any other organ of the system. The mind and brain would certainly be affected by the long continued and excessive use of liquor and opium. I am satisfied the mind would be affected by alcoholic drinks. A man's brain, when he is intoxicated, is congested; in a state of congestion. It is brought about by the excitement, that produces a flow of blood, and an excessive action of the brain itself. There is always a corresponding depression. A man gets drunk; when it passes off, a corresponding depression follows always. It makes him dull and stupid, and acts almost as bad as the stimulant itself. It is an abnormal condition of the brain. A man who gets drunk frequently, may have "*delirium tremens.*" There is danger of cooling off too suddenly, for depression follows. It is necessary to keep up a degree of stimulant. If he went too far down, there might be danger of death. It is one of the curative means we adopt for relief. A sound mind is one in perfectly healthy condition. When a man is drunk, he is not sane; that is my opinion. I think the excessive use of alcoholic drinks would effectually destroy the brain, if continued long enough. He cannot pass through four or five years' use of liquor, without having his mind very materially impaired. I mean when the use is continuous. I do not consider prisoner a man of sound mind, nor have not for some time. About the time of the shooting, I met with him every day; he was all the while under the influence of these stimulants. I do not consider him of sound mind now.

*Cross-examined:* I never heard of, or saw the wound on his head before now. I do not consider a man who is drunk sane. If a man can recollect what took place before he was drunk, is he insane? If he recollects, it is a sign of sanity, as far as it goes; he might have been sane before. I consider no man sane, who is under sufficient amount of whisky to make him drunk; then I do not consider him sane. When

a man is under "*delirium tremens*," he is insane in that sense of the term; but "*delirium tremens*" is not insanity. When a man is under the influence of fever, so that he sees strange things, he is not insane; that is delirium. The mere absence of the knowledge of right and wrong, temporarily, is not insanity. I think prisoner is afflicted with insanity. What indication of insanity have you seen in prisoner? I would dislike to mention some things. I will give you one. We have been intimate for twenty years; we practiced when there were no others here; we were very intimate. He has frequently come to me, and called me Aleck. He would come and say: "All I have to do to get him, is just simply to touch him; that is all that is necessary." I have seen other things, in connection with this case, that to mention would look like prejudice, and I would not like to be required to mention it. At the time of the occurrence of what I mention, he was under the influence of whisky and opium; then you would see him muttering, talking to himself. I have seen him frequently talkng to himself. That is no evidence of insanity; the talking to himself might be produced by the drink or opium; that is frequently the condition of drunken men. I think no one who is a physician can tell morphine by the smell. I would not give morphine simply by the sight; I would dislike very much to take it on the judgment of anybody, simply by the sight. I do not believe any man can tell it by the sight; I do not know how to compare the amount he used, of morphine, with that of others. I have seen him take it in very large doses. I know a great many people that do it; they do not attend to their business as they ought to do—as well as without it. They know right from wrong, probably, but I think they would do it better without opium. No man under the excessive use of either, is a sane man. If a man is excessively avaricious, and kills a man to get money, I consider him insane. In that sense, a man might be so hungry as to kill a man to get a piece of bread, I should consider him insane,

and not responsible for it. I do not think it is possible to use opiates and liquor, without affecting the brain; I never knew any one to use them, without its affecting his brain; I believe it makes persons crazy. I think every man who uses liquor, when excited by it, is insane, and it impels him to do things he would not do without it. I do not know any crazy doctors in town; I don't know any habitually drunk, practicing medicine, with exception of prisoner. If I knew one accustomed to get drunk every day, I should consider him a crazy man. I would not like to risk him as a physician. They are many merchants and doctors who habitually drink, and yet follow business right.

*Re-direct examination*: I could give other indications of insanity similar to those I have given. These are the *data* on which I form my opinion. I knew him when he was under the influence of whisky and opium; he is so different that I am satisfied he is not a sane man. These are what I base my opinion on.

Dr. W. F. WESTMORELAND testified: I am cousin to prisoner; he is between fifty-five and sixty years of age, I think; he commenced the practice of medicine, I think, in 1850—in 1849 or 1850. I am a regular licensed practicing physician; I knew prisoner's position before and up to the war; I practiced with him in 1852; I have met him frequently since the war; I knew him intimately. His practice since the war has never been as good; pecuniarily he is less prosperous. In 1869, I think, he was living here. I have been about Redwine & Fox's store frequently; I think ever since the establishment of the firm, up to the difficulty. I don't know that I have seen him take many drinks, but I have seen him when under the influence of stimulants; I knew of his using opium and morphine; I have seen him take them; I know he has taken it, from the effects I have seen produced. Morphine can only be guessed at by the sight; it would be difficult to detect it by the smell; I do not know that it could be detected by the breath. Opium

would have the odor, to a certain extent; more than morphine; I am not positive with regard to that; I am not positive whether it leaves an odor or not. I practiced with prisoner from July, 1851, to the fall or winter of 1852. His demeanor was very different then from what it is now; his conduct is very different now; there is a very marked change. I have never seen him take only a few drinks; I have seen him frequently under the influence of drink, or some stimulant. I have seen him when I considered him under the influence of opiates; at other times under alcoholic stimulants, as one would from a debauch from stimulants. It is frequent to use stimulants in extreme cases; in an extreme case it would be desirable. There is a class of practitioners who do not use stimulants. In some the nervous system is more involved than others; in some the effect is more perceptible on the stomachic organs; their action is interfered with; the long use of opium and morphine would affect the brain; it will have a corresponding effect when withdrawn; when kept up a long time the effect would be in proportion to the amount taken. The effect of alcoholic drinks is varied. In some instances, disease of liver, or, in a short time, the destruction of that organ; fatty liver and various affections of the liver; sometimes affections of the stomach; in others the kidneys; the disease known as Bright's disease of the kidneys. The action of all the organs is dependent on the brain or nervous system. If the nerve is cut off from an organ, it ceases its action. The brain being affected, would affect more or less the other parts of the system. The long use of liquor impairs the mental faculties. Any lesion of the brain (mind) impairs, to the same extent, its reasoning faculties; I mean the emanations from the brain itself. While I am not a materialist, I am, to some extent. The divisions of the mind are different, according to man's fancy of authors, perception, reasoning faculties, his will, etc. What is a sound mind? One that is normal; one not changed; one in which there has been no lesion; no organic change. By lesion, we

mean a change in the substance of the organ.    We may have
a functional derangement without organic change.    Different
men are affected differently.    Stimulating drink does not pro-
duce the same effects on all alike ; some would die from liver
disease, some from kidney disease, etc.    The effect on the
brain is the thickening of the membrane.    There is a pecu-
liar character; the color is changed, and other changes too
tedious to mention.    In some there is no perceptible change,
not in the substance of the brain.    Sometimes it has a soft-
ening effect on the membranes ; would have an "atrophy"
after a certain time.    When the brain is thus affected, the
mental faculties are impaired, and some instances where there
is no perceptible organic change.    When a man is not habitual-
ly drunk ; when he gets very drunk how is his brain affected ?
There is more blood then ; congestion of the brain, to some
extent, when he is beastly drunk ; when in this beastly con-
dition he has too much blood, but it is not active; a man
may take a few drinks and the brain is more active; when
you get beyond that point to congestion so that the brain
does not act you have coma.    When a man is so drunk he
cannot rise, his mind is not in a sound condition temporarily.
Reason is temporarily dethroned ; when he gets sober it
passes off and reason returns; the normal condition is re-
stored, and we have a return to its normal condition.    Would
not a mind long affected every day, through a series of three
to five years, be impaired to a greater extent than a person
only occasionally intoxicated ?    It would be.

I fill the chair of surgery in the medical college here; I
have filled it since 1855.    Would a wound on the head, as
before described, fracture the outer covering of the head?
There must be, necessarily, a fracture ; I think it would have
a greater effect long under these influences, than if he had
not been under them ; the effect would be the same on the
head of a drunken man as on a sober man, if their tempera-
ment was the same.    There is a very great difference between
individuals in the injury, or the result of a blow on the head ;

one man may have a fracture driven in on the brain, in one case, while a slight injury, apparently, in another, would produce very different results. A man, where the brain is irritated by liquor, would be more liable to a permanent injury than a man of the same temperament, sober. A blow on the head of one man would not produce the same effect as on another man. Injuries of the brain induce a lesion of the brain itself, if the inflammation is of a permanent character. If inflicted on the head of one already excited, it would increase the action. In a recent injury, there would be greater sensativeness to the touch—more than one of long standing. If the inflammation subsides, the soreness subsides with it; the soreness is from the skin. A wound of a year's standing ing is not likely to be very sensative; there are some wounds of long standing that are very sensative, in a kind of neuralgic condition. The signs of insanity are so varied it would be difficult to describe them : not being able to reason rationally, *monomania;* a man may be irrational on one and good on others; some go from society, while others want to be prominent. It is owing to the phases of the insanity, as to what will be presented. What I call temporary insanity, is the result of some functional derangement of the brain—for instance, fever; he does not talk rationally : I call that temporary dethronement of reason, like when a man is drunk; that is similar. Do you consider the prisoner a man of sound mind? He has not the mind he had ten years before; he had a different mind; his reason was different; his mind is deteriorated. There is a nice distinction to be made; his mind was not sound, it was deteriorated; not the same mind he had, not his mental faculties, as he had before.

*Cross-examined:* I never saw or heard of the wound on his head before the difficulty.

W. F. WESTMORELAND, re-introduced : I thought I was sufficiently distinct, that prisoner's mind was not sound, and went to explain that his mind is not in a normal condition; that he is not himself. I may not have seen prisoner for sev-

eral days before the shooting.   For several years I have not regarded him as of sound mind; I think it was affected by the causes I have already stated : by intemperance, both in alcoholic drinks and morphine.   I think his mind was affected with insanity, if you call an unsound mind insanity. There are two kinds.   Prisoner is afflicted with *dementia;* his mind is afflicted with changes I have described in inebriates.

*Cross-examined:* At times I do not think he could distinguish right from wrong.   I can only speak of the general effect, that to a certain extent he was demented.   His brain was not active, nor in its normal condition.   Has his mind been in such a condition that, if he killed a man, he did not know it was right or wrong ?   I did not say that.   That question I could not answer positively.   At times he would not care, at times he would.   I think, perhaps, he always knows it is wrong to shoot or kill a man.   Was he more demented then than now ?   I think his intemperance has not been so great since as it was then.   The cause producing the lesion of the mind is evidently liquor and morphine. The cause producing the effect is withdrawn.   The cause was whisky.

The following was agreed upon by counsel, as being the testimony of Dr. Pomeroy, who was suddenly ill: Dr. Pomeroy says he has known the defendant, Dr. Harrison Westmoreland, for the last fifteen or sixteen years; has known him intimately ; had many conversations with him, and on many subjects, both before and after the shooting of Dr. Redwine; he has been with him much, and talked with him much.   He has been, since the war, a drinker of intoxicating beverages, to excess, being nearly all the time under its influence; that frequently he has been in conversation with him, on subjects to each interesting, and he would suddenly break from the conversation, and talk on something foreign to the subject of conversation, and strangely and foolishly, as to say : "I must go to the mountains; have a tiger to

catch, a lion," etc. ; that from his intercourse with him, he is satisfied he was not, in 1869, and now, of sound mind ; that he went to see prisoner at the guard-house the next morning after Dr. Redwine was shot, and talked with him, and he then believed he was a deranged man ; that he had the opinion his mind was not right before the shooting of Dr. Redwine, and talked about it then, mentioning the fact to the family of Dr. Westmoreland.

REBUTTAL BY THE STATE: Fox, one of the proprietors, and Berry and Palmer, two of the clerks of Redwine & Fox, testified that Westmoreland was constantly at the store, and bought his medicines there; that he frequently used very dangerous medicines, but used them properly, and always exercised sound judgment in putting up his prescriptions. They said he was a man of good mind and polished education—frequently quoted long passages from Virgil and Homer, etc. They said he was frequently drunk and used morphine, and that when under the influence of liquor acted like other drunken men. They all testified that he had, as far back as 1867, showed them the depression in his skull, calling it a furrow in his skull.

Fox testified that he had seen such depressions in other persons' skulls, and that they were so born. He also testified that he had frequently before ordered Westmoreland from the store when he was drunk.

Dr. Joel Branham testified that he, Dr. Crawford and Westmoreland were in the back room at the stove; that Westmoreland was cursing Mr. Rawson, who was not present, saying had he found him he would have killed him. Ladies were in the front of the store, when Redwine came and led him out, as already stated. He frequently talked with Westmoreland on medical subjects, and thought him well informed when sober. In the streets he seemed melancholy and droopy. In said conversation he was rational.

Dr. Ray testified that he knew Westmoreland intimately and knew nothing peculiar about his mind. For one who

drank so much, he showed more sense than any one witness ever knew. He did not doubt that long continued and excessive use of opium and morphine was injurious to the mind and body; many do take it without visible injury. Long use of alcoholic drinks debauches a man.

John H. James testified that in the summer of 1869, Westmoreland applied to him to rent some rooms, and talked sensibly as other men; seemed to be drinking, however.

Dr. Crawford said he had known Westmoreland for several years, and from his observation considered him of sound mind.

Question: "What is the effect of constant and excessive use of morphine and opium for four or five years?" "In some cases effect bad, in others without much effect. Sometimes it would affect the nervous system, sometimes derange the general health. In some cases it might affect the brain, in others it might not. Some are seriously affected by its habitual, long continued use, others live on to old age."

Asked as to the long continued, excessive use of liquor, he answered: Sometimes it has bad effect; some drink with impunity, apparently. I have seen some men who have been drunk twenty years. The system, however, would be more or less affected.

The following was read to him from the United States Dispensatory, page 626: "Opium is a stimulant narcotic. Taken by healthy persons, in moderate doses, it increases the force, fulness and frequency of the pulse, augments the temperature of the skin, invigorates the muscular system, quickens the senses, animates the spirits and gives new energy to the intellectual faculties. Its operation will thus extend to all parts of the system, is directed with peculiar force to the brain, the functions of which it excites sometimes even to insanity or delirium," and witness was asked if that was correct? He said it may be correct as to some persons.

Jonas Smith testified that he had long known Westmoreland, and saw him at Muhlenbrink's grocery about two hours

before the shooting and conversed with him about fifteen minutes and he spoke rationally; he did not drink while witness was there, though he appeared to have taken a drink or two. Has seen Westmoreland too drunk to attend to business; then he behaved like other drunk men.

The evidence closed, defendant's counsel stated that they would not contend that he was drunk when he shot, but was insane.

The trial began on Tuesday. Saturday evening the jury asked if they might walk about on Sunday in charge of a bailiff, and the permission was granted.

After the argument was concluded, defendant's counsel asked the Court to charge as follows: "Unless you are satisfied from the evidence, beyond a reasonable doubt, that the defendant, at the time of the alleged offense, was a person of sound memory and discretion, you are bound to acquit."

"To constitute the crime of murder, under our law, the person committing the act must be, at the time, of sound mind and discretion, and that if the jury are satisfied, from all the evidence in the case, that the mind of the accused was at the time afflicted with insanity, he is not guilty of an assault with intent to murder."

"The word 'insanity' includes idiocy, lunacy, and all other kindred forms of mental infirmity, such as mania, *dementia*," etc.

"Even if the evidence, as to the insanity of the defendant, should leave it in doubt as to whether he was insane at the time of the commission of the alleged act; if it also leaves in doubt his sanity at that time, he is entitled to an acquittal."

"Though the evidence may leave the defense of insanity in doubt, if upon the whole evidence in the case, the jury entertain a reasonable doubt as to the sanity of the defendant at the time of the commission of the alleged act, they are bound to acquit him."

"If the jury cannot say, beyond a reasonable doubt, that

the defendant was sane at the time of the commission of the alleged act, or cannot say whether, at that time, he was sane or insane, they are bound to acquit him."

"If, from the whole evidence, the jury believe the defendant committed the act, but at the time of doing so, was under the influence of a diseased mind, and was really *unconscious* that he was committing a crime, he is not, in law, guilty of an assault with intent to murder."

"The law holds no one responsible for his act, when his mind was so diseased at the time of the act as to be without reason, conscience and will, and when from such causes, the party accused was an involuntary instrument of such a disease and incapable of refraining from the commission of the act."

"To convict a person of crime, he must have memory and intelligence to know that the act he is about to commit is wrong, to remember and understand, that, if he commit the act, he will be subject to punishment, and reason and will to enable him to compare and choose between the supposed advantage or gratification to be obtained by the criminal act and the immunity from punishment which he will secure by abstaining from it."

"If the proof shows that the mind of the accused was unsound, diseased and afflicted with insanity, the question will be whether the disease of his mind existed to so high a degree, that for the time being it overwhelmed the reason, conscience and judgment, and whether the prisoner, at the time of the shooting, acted from an irresistible and uncontrollable impulse; if so, then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it."

"The opinion of experts is competent testimony, and when the experience, honesty and impartiality of the witnesses are undoubted, their testimony is entitled to great weight and consideration, and is intended to aid the jury in coming to a correct conclusion in the case."

Westmoreland *vs.* The State of Georgia.

The Court refused so to charge, but on the contrary charged the jury as follows:

The defendant is charged with an "assault with intent to murder" Columbus L. Redwine, by using a weapon likely to produce death.

The law presumes that the defendant is innocent. The State makes the charge, and must prove it. It must, by testimony, remove the presumption of innocence.

An assault is an attempt to commit a violent injury on the person of another. Murder is the unlawful killing of a human being, in the peace of the State, by a person of sound memory and discretion; with malice aforethought, either express or implied. There must be an unlawful killing of a human being; it must be done by a person of sound memory and discretion, and with malice aforethought; that malice aforethought may be either express or implied.

Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances, capable of proof—such as deliberate preparation for committing the act : a previous quarrel, threats, some expressed grudge, and the like. Malice shall be implied, when no considerable provocation appears, and when all the circumstances of the killing show an abandoned and malignant heart. If there has been an assault or provocation, and an interval between the assault or provocation, and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder.

What the law means by malice, in the crime of murder, is an intention to kill a human being, in a case where the law would neither justify, nor in any degree excuse the intention, if the killing should take place as intended. If the death be caused by the use of a weapon, which, as used, was likely to produce death, the person using it will be presumed, in the absence of proof to the contrary, to have used it with the intention of killing. When a man commits an unlaw-

Westmoreland *vs.* The State of Georgia.

ful act, unaccompanied by any circumstances justifying its commission, it is a presumption of law that he acted advisedly, and with an intent to produce the natural and probable consequences of the act.

It is not necessary that the deliberate intention to kill should exist for any particular length of time before the crime is committed. In order to render the act of shooting a crime, there must have been a union or just operation of act and intention.

Intention will be manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused. In this case it must appear to you that the defendant, at the time of the assault, was of sound memory and discretion; that he attempted to commit a violent injury on the person of Columbus L. Redwine; that he did it with the intent to murder him by using a weapon likely to produce death.

If these facts have been shown to you by the testimony, you would be authorized to find the defendant guilty; if they have not been shown, you will find him not guilty.

The defendant must have been of sound memory and discretion. In reference to sanity or insanity, the opinions of witnesses unskilled on such subjects, are admissible as evidence, and are to be weighed by the jury, provided such opinions are accompanied by the facts upon which they are founded. The opinions of experts, medical men, are admissible and are entitled to great respect. This, like all the other testimony in the case, is intended to aid you in coming to a just and correct conclusion in the case; yet it is, at last, from the facts proven, that you are mainly to decide. You are not bound by any opinion unless it is sustained by the facts proven.

The law presumes every man of sound mind, till the contrary appears; and the burden of proof is on the defendant to show that at the time of the commission of the act he was not of sound mind.

And it ought to be made to appear to a reasonable certainty, to your reasonable satisfaction, that, at the time of the commission of the act, he did not know the nature and quality of the act; or, if he did, did not know that the act was wrong; and it devolves upon you to decide whether the defendant has, by proof, rebutted this legal presumption of sanity. This is to be determined by the testimony. If a man has capacity and reason sufficient to enable him to distinguish right and wrong, as to the particular act in question, if he has knowledge and consciousness that the act he is doing is wrong, and will deserve punishment, he is, in the eye of the law, of sound memory and discretion, and is responsible for his acts.

If he has not that measure of memory and discretion, he is not responsible, and should be acquitted. If the habit of using intoxicating drinks or opiates, has created a settled unsound condition of the mind; a fixed frenzy or insanity, whether permanent or intermittent, and such unsoundness went to the extent of leaving him without capacity and reason sufficient to enable him to distinguish right and wrong, as to the particular act in question, and to deprive him of the consciousness that the act he was doing was wrong, and would deserve punishment, he would not be responsible for his acts while in that condition.

If, by the habit of using intoxicating drinks, or opiates, the defendant's mind had become impaired ; was in a settled diseased condition, but he still had capacity and reason when sober to enable him to distinguish right and wrong, as to the particular act in question, had knowledge and consciousness that the act he was doing was wrong, and deserved punishment, he would be responsible for his acts.

Drunkenness is not an excuse for crime, unless it was occasioned by the fraud, artifice or contrivance of another. If the defendant had the measure of mind of which I have spoken, when sober, and he voluntarily used intoxicating drinks, and by that means deprived himself of that memory

and discretion, he would be responsible for his acts, while in the fit of intoxication. The law does not permit a man to avail himself of his own gross vice and misconduct to shelter himself from the legal consequences of crime.

If, at the time the act was committed, the defendant was under the immediate influence of opiates, or intoxicating drinks, and had not the memory and discretion of which I have spoken, but would have had that memory and discretion, but for the immediate influence of the opiates or drinks, he would be responsible for his acts ; otherwise, he would not. At the time the act was committed, was the defendant under the immediate influence of intoxicating drinks or opiates ? If so, if he had been free from that immediate influence, at that time, would he have had reason and discretion to have distinguished right and wrong, as to the particular act in question ? Would he have had knowledge and consciousness that the act he was doing was wrong, and would deserve punishment ? If he would have had, he was responsible for his act. The test is applied to his mind when sober, and not when drunk. Drunkenness, like all the other proof, may be looked to, to see whether he had the intent to murder ; but you are to take the measure of his capacity when free from the immediate . influence of intoxicating drinks, or opiates, to determine whether he was responsible. The question is not whether the defendant had a mind equal to that of others ; nor whether it was equal to what it had formerly been ; but whether, at the time of the commission of the act, he had the legal memory and discretion of the law, which I have explained to you. If the ordinary condition of his mind, when free from the excitement of liquor, was regular, capable of understanding the moral quality of his acts—of speaking, reasoning and acting coherently, and he voluntarily deprived himself of reason, by intoxication, and committed an act in that condition, he is responsible ; otherwise, he would not be.

If, after a careful survey of all the testimony, you have a

reasonable doubt of the defendant's guilt, you will acquit him. Absolute certainty is not to be attained by any mode of judicial investigation. A moral or reasonable certainty is all that the law requires, and all that is attainable. Still his guilt must be made plainly and manifestly to appear; it must be shown beyond a reasonable doubt, a doubt that grows out of the testimony, and leaves the reasonable mind wavering and unsettled, cannot be satisfied from the evidence. You cannot create for yourselves a doubt, and act upon it; you cannot raise an artificial or captious doubt, in order to acquit. The doubt should be real, and honestly and fairly entertained, after all reasonable efforts have been made to find out the facts. If such a doubt as that exists, you will acquit him; if such a doubt does not exist, it would be your duty to convict. You are to receive the law from the Court, and the testimony from the witnesses; and you will apply your conclusion as to the law that you receive from the Court, and your conclusion as to the facts you receive from the witnesses together, and, from your judgment of both, form your verdict. The Court expresses no opinion as to what has or what has not been proven. In civil cases, the preponderance of testimony is considered sufficient to produce mental conviction. In criminal cases, a greater strength of mental conviction is held necessary to justify a verdict of guilty. Put far from you all prejudice or bias; solemnly, carefully and impartially consider the case, and a true verdict give according to the evidence. As you may find him, guilty or not guilty, so express it in your verdict.

The jury found the prisoner guilty. His counsel moved for a new trial, upon the following grounds:

The Court erred, 1st. In holding Glazener to be a competent juror. 2d. In refusing to dismiss the panel of jurors selected by the bailiff. 3d. In allowing Howell to tell what prisoner said, when he did not remember all he said. 4th. In refusing to let Calhoun tell what prisoner said about the

wound on his head, who inflicted it, etc.    5th. In refusing to charge as requested, in part and in whole.    6th. Because the charge, as given, was inapplicable to the facts of the case.    7th. Because the verdict was contrary to the law and testimony.    8th. Because the jury, after they were impanneled and charged with the consideration of the case, several times separated, and walked in public places, through public streets, and along public thoroughfares, where large crowds of persons were assembled.    9th. Because written papers were received and sent out by some of the jurors, while they were confined, and carpet bags received by them, and communications were had with persons who were not jurors.    10th. Because it was communicated to the jury, that one Gresham, an officer of Court, had made a bet on prisoner's conviction.    11th. Because the jury several times were furnished with ardent spirits, had it in their rooms, and used it, by drinking the same.

As to these last grounds, the following affidavits were read:

GEORGIA—Fulton County:

Manson Stroud, being sworn, says he was the bailiff who had charge of the jury in the case of The State *vs.* Harrison Westmoreland, charged with the offense of assault with intent to murder, tried at the present term of Superior Court of Fulton county; that he had charge of said jury from the time they were impanneled, until they were discharged from the consideration of the case, to-wit: from Wednesday, the 10th day of May inst., until Tuesday morning following; that said jury was taken to the Air Line House, on Pryor street, to take their meals and sleep; that several times after the case was submitted to the jury, said jury separated; that it was impossible for deponent, as an officer, to control some of them; that on Sunday morning, after breakfast, while taking a walk, three of the jurors, against the consent and remonstrance of deponent, separated.

from their fellow jurors, and for some time refused to accompany their fellow jurors. One of them cursed deponent, and said they had a right to go where they pleased; that on Sunday, after their return from the woods to the Air Line House, four of the jurors were in a room up stairs, while the other eight were below stairs; that in the afternoon of said Sunday, about three o'clock, the jury insisted on taking another walk, and against the wishes and remonstrances of deponent, they left the Air Line House, passed by the Stubblefield House and American Hotel, where a crowd of persons were assembled; went through the passenger depot to Loyd street, and thence to Decatur street, to the city cemetery; that on the route, they saw, and came in contact with various persons; that they passed through some of the most public streets and thoroughfares in the city, meeting persons going to, and from church, and other places; that three of said jurors stopped at a church, and refused to leave, and deponent was compelled to leave them; that one of the jurors was clean shaved, and deponent accused him of leaving the room to be shaved, which he denied; that carpet bags containing clothes, as deponent supposed, were sent to some of the jurors; one of them he did not examine; that some of the jurors received and sent out written papers. One juror went to his house, and talked to his wife. Deponent found it impossible to control them.

The jury knew of a bet being made by one Gresham, an officer of Court, on the conviction of the prisoner. Deponent informed them that such bet had been made. On Sunday morning, the jury seemed to be quite lively. Deponent says that he used his best endeavors to control said jury, but was unable to do so, they asserting that the judge said they could go where they pleased. Deponent knows that the jury had liquor (ardent spirits) in their room, more than once, and used the same.                    MANSON STROUD, L. C.

Sworn to and subscribed before me, May 19th, 1871.

THOMAS SPENCER, J. P.

Westmoreland *vs.* The State of Georgia.

GEORGIA—FULTON COUNTY:

In person, before me, came John Eddleman, who, being duly sworn, deposes and says, that he heard Mrs. Jackson, wife of T. C. Jackson, who was on the jury who tried the defendant, Westmoreland, ask the said Jackson when he was coming home, and he told her that he did not know whether he would ever get home or not.

This was on Sunday, when the jury were walking out on Pryor street.

JOHN EDDLEMAN.

Sworn to and subscribed before me, this June 10th, 1871.

JOHN MILLEDGE, Jr., Notary Public.

GEORGIA—FULTON COUNTY:

T. P. Westmoreland and T. W. J. Hill, two of the attorneys for Harrison Westmoreland, in the above stated case, being sworn, say: That, after the trial of said case, hearing that the jury had been guilty of misconduct, they called on Manson Stroud, the bailiff who had charge of the jury, for the purpose of ascertaining the truth of the matter. That, at first, he was reluctant to give any information, but finally told us all that transpired, within his knowledge. All the facts given us by him was reduced to writing, in his presence, and read to him and assented to by him. At his request, we omitted to state in the affidavit that he furnished the jury with spirituous liquors, and that he knew it was wrong. He also stated to us that he had had charge of many juries, and that was the most unmanageable jury he ever had under charge. He stated to us that three of the jurors drank a pint of whisky by themselves. These facts, at his request, were omitted in his affidavit. These deponents say that in his affidavit, no fact was left out, except at his own request.

T. W. J. HILL,

T. P. WESTMORELAND.

Sworn to and subscribed before me, June 13th, 1871.

WM. T. NEWMAN,

Notary Public, Fulton county, Georgia.

GEORGIA—FULTON COUNTY:

Harrison Westmoreland, the defendant in the above stated case, and L. J. Gartrell, T. P. Westmoreland, T. W. J. Hill and Milton A. Candler, the attorneys for Harrison Westmoreland, being sworn, say: That the facts stated in the affidavit of Manson Stroud, the bailiff who had charge of the jury in said case, made before Thomas Spencer, Justice of the Peace, on the 19th day of May, 1871, and the facts stated in the affidavits of T. A. Poole, made before J. H. James, Notary Public, on 3d June, instant, and the facts stated in the affidavit of J. S. Keith, made before Daniel Pittman, Ordinary, on 6th June, instant, relative to the irregularity and misconduct of the jury, and communication with them, did not come to the knowledge of deponents until after the trial of said case, and the jury had been finally discharged from the same, after they had returned a verdict.

> H. WESTMORELAND,
> T. W. J. HILL,
> MILTON A. CANDLER,
> LUCIUS J. GARTRELL,
> T. P. WESTMORELAND.

Sworn to and subscribed before me, June 12th, 1871.

W. N. VENABLE, Clerk.

GEORGIA—FULTON COUNTY:

Thomas A. Pool, being sworn, says he was one of the jurors impanneled to try the defendant in the above stated case; that Manson Stroud was the bailiff who had charge of said jury, from the time they were impanneled until they were discharged from the consideration of the case; that the jury was taken to the Air Line House, on Pryor street, to take their meals and sleep; that, on Sunday before the trial was complete, the jury took a walk to the woods; while out walking, all of the jurors stopped at a church, some separated from their fellow-jurors, and the bailiff had to go back after them. On Sunday morning, while at the Air Line House, one of the

jurors went out of the room and got shaved; he said the price of shaving was a *quarter*. Some of the jurors went to the privy, unaccompanied by the officer; some of the jurors received carpet-bags; some jurors received written notes. Deponent mentioned to bailiff he ought to read the notes, which he declined doing. The jury, in the afternoon of Sunday, took another walk, going up Pryor street to the corner of the Stubblefield House, across to American Hotel, thence to car shed, through the car shed to Loyd street, thence to Decatur street, and thence to the cemetery. While on the way, deponent heard remarks made by persons to the bailiff and jury. Several persons were at the cemetery while the jury was there; the jury returned by a different route to the Air Line House. Deponent protested against such conduct, and mentioned the impropriety of the same to the bailiff. Some of the jurors seemed to be uncontrollable. On Sunday, one juror conversed with a person, (deponent supposed his brother.) The jury knew of a bet being made by one Gresham on the verdict of the jury; the fact was communicated by the bailiff. The jury, several times during the trial, had ardent spirits, and used the same by drinking, and after the jury had made up their verdict, and before they returned it in Court, they had and used ardent spirits.

THOMAS H. POOLE.

Sworn to and subscribed before me, June 3d, 1871.

J. H. JAMES.

GEORGIA—FULTON COUNTY:

J. L. Keith, being sworn, says that he is the proprietor of the Air Line House, in the city of Atlanta; that the jury impanneled to try Harrison Westmoreland, indicted for "an assault, with intent to murder," at the present term of the Superior Court of Fulton county, took their meals and slept at the house of deponent; that, during the time the jury was at the house of deponent, he let the bailiff who attended said jury have ardent spirits, by the bottle, three different

times; said bailiff informed deponent the liquor was for said jurors.                                    J. L. KEITH.

Sworn to and subscribed before me, June 6th, 1871.

DANIEL PITTMAN, Ordinary.

In reply thereto, the following affidavits, were read by the State's counsel:

GEORGIA—FULTON COUNTY:

Personally appeared before me, the attending officer, Manson Stroud, the bailiff, who had charge of the jury in the Westmoreland case, and for explanation of his affidavit made in this matter, on the 19th of May last, deposes and says: The jury was kept in the Air Line House; that they ascended one flight of stairs, and at the landing had a room called their sitting room; from the hall, on the same floor, was a platform, leading about twenty or twenty-five feet to the privy, the way to which is planked up so high that no one can go to or from it, except by the passway or hall on which their sitting room is situated. They had another room up stairs, (with stairway leading from the sitting room hall to the third floor hall.) The only separation of the jury known to deponent, was, that the jury being troubled with bowel affections, frequently, one or more, went from the jury to this privy, but on going and coming could not have any communication with the outside world. And one time, on Sunday, four of the jury being sleepy, this deponent let them stay in the sleeping room, he having locked them up there and kept the key with him, and he staid with the other eight in the sitting room, where he could see the stairway going to the sleeping room. This sleeping occurred between ten o'clock A. M., and the dinner hour; deponent waked them up at the dinner hour.

The separation alluded to, while out walking Sunday morning, was in this wise: The jury had been permitted, in open Court, by consent of the counsel and order of the

Court, to walk out in my charge during Sunday. About eight o'clock A. M. they went directly south from the hotel to the woods, and got back about ten o'clock. In coming back, when we got to the corner of Washington and Mitchell streets, at the Baptist Church, some of the jury wished to go back to the Air Line House, and part wished to go towards the depot.

Jackson, Barrett and Carlton stopped at the church steps, on the corner of said streets; the others went down Mitchell street about forty or fifty yards. I stood where I could see both parties, and asked the three to go on with the others; they hesitated and grumbled, because the majority would not go their way. One of them did curse the deponent, and he started off to the majority, and before we got to them, these three came on and joined the body. Nobody passed, during their separation, either party, and the separation did not last three minutes, if that long. That he opposed the second walk in the evening, only because he did not feel like taking a long walk; they did pass through the streets as stated, and did meet persons going and coming, but no one spoke to them, nor they to any one; this is all I meant by coming in contact with persons, and so stated to the writer of the other affidavit when it was made and written. The three jurors stopping at the church is the incident already mentioned. No other stopping or being near a church occurred, and my leaving of them was starting to the majority, as aforesaid.

One of the jury was shaved, but he said he had his tools in the room, and deponent does not think there was any barber shop in the hotel : just before this, some one had brought this juror a small carpet-sack, saying it had Mr. Carlton's clothes in it; the key was to it, and as Mr. Carlton needed clean clothes, deponent let him have it, and, being assured it contained only a change of clothes, did not examine it. He supposes the shaving tools were in that sack. No other carpet-sack was handed to any juror, except to D. R. Prothro,

and deponent knows it had nothing in it but a change of clothing, for he examined it.

If any note was received by any juror, this deponent does not know it. Carlton wrote a note to his family, telling them where he was and asking for a change of clothing. Agricola, a baker, wrote a note to his wife, telling her how much bread to bake for customers.

These notes were read by me, and I suppose the jury, or some of them, may have read them. Carlton's I sent out, and his carpet-sack was returned in answer to it. I concluded it might be wrong to send Agricola's—the negro who wished to carry Agricola's note heard it read, and heard him and me talk of it, and I remarked: "You have heard what Mr. Agricola said to me—go and tell his wife." This is all I know of notes, to or from the juror.

The going of a juror to his house and talking with his wife, was in this wise and not otherwise. Jackson's house is directly on the route from the Air Line House to the woods, and near the suburbs; in going out Sunday morning, they passed by without stopping; in coming back, I took the jury in to the well to drink. Until we got in, I did not know it was Jackson's house. While the jury was taking water, Mrs. Jackson came on the piazza; her husband asked her if she was well and was going to church, and where her sister was? She answered these questions, and neither said anything more; nor were they closer than eight feet to each other, and I was between them. He did not go into the house, nor did she come out, and we staid on the lot only long enough to draw a bucket of water and all to drink— say five or ten minutes.

As to the betting, this deponent says that, some time during the trial, the deputy sheriff, Perkerson, told deponent, "if Gresham (bailiff) speaks to a juror, or comes near one, bring him directly to me." I asked him why, and he said Gresham had been betting on the verdict, but did not say which way, nor had I any idea which way he bet. When we

Westmoreland *vs.* The State of Georgia.

went to the room, I cautioned the jury not to let Gresham come near or speak to them, without telling me; and when asked why, I told them what Perkerson had told me; I did it simply as a caution, to guard against the intimated approach by Gresham.

The only liquor had by the jury was as follows: On three different mornings, the jury wished a morning dram, and on each occasion, I gave them a pint of rye whisky; deponent only tasted it one morning; three of the jury, he thinks, did not taste it; he thinks the jury had a pint on each of the following days, to-wit: Wednesday, Friday and Sunday; they had no more, and this deponent took care that no one should take more than a morning dram.

All I meant by the jury being uncontrollable was, that I could not prevent such separation as aforesaid, going to the privy, etc.; but the jury behaved as well as a jury could do, and were very gentlemanly, except the one who cursed me because I would not take the jury his way in returning, as aforesaid.

He has heard the affidavit of the juror, Poole, read, and the foregoing and following explains it. He denies refusing to read any note sent to the jury, and does not remember any being received, or Poole saying any such thing as to reading them. No remarks were made *en route* to the cemetery, except that, in going, they were met by a negro with the carpet-sack for Prothro, (a juror) and asked to deliver it to him; he did not know Prothro's name, but pointed him out, and I then told him to go and leave the carpet-sack at the Air Line House, and we went on, and when we got back, got the sack for Prothro; that is the carpet-sack already aluded to. If any other remarks were made deponent does not know it.

The cemetery covers perhaps over twenty-five acres of land, and persons were there while the jury were; but the jury had no communication with any one there.

Poole did not mention to me any impropriety in the jury nor protest against their conduct; he was the main man insis-

ting on having the liquor, and he behaved no better than the other jurors. When Carlton's brother brought his carpet-sack, Carlton said something to me about his business in his brother's presence, and in the hearing of the jury, if they were listening. Carlton was in the jury-room and his brother outside ; they did not speak to each other at all.

There was no other incident to which Pool's affidavit can allude but this; if so deponent does not know it. All these facts were told to the writer of the first affidavit before it was written; and I requested him to put them in, but he said the other side would make any explanation of what I might make affidavit to, and I, supposing he had a right to put it down his way, suffered it done ; and I came and told the solicitor that I wished him to explain it before it came up, and he said he would, or words to that effect.

MASON STROUD, L. C.

Sworn to and subscribed before me, this the 9th day of June, 1871.    W. R. Venable, Clerk.

GEORGIA—Fulton County :

Personally appeared before me, the undersigned, John M. B. Carlton, who, being sworn, deposes and says: that he took the carpet-sack to his brother, while on the Westmoreland case, and delivered it in presence of the bailiff, and that it had nothing in it but a change of under-clothing, and a hand-kerchief or two; that his brother's wife had been expected to go from home, and his brother asked if she had left, when deponent replied, "Yes." The juryman Carlton was then asked if he had collected certain rent, and he answered, but what the answer was is not now remembered. This, he believes, is all that was said ; and it was rather done by using the bailiff as a medium, than by direct conversation. Nothing was said about, or even hinting at, the case.

JOHN M. B. CARLTON.

Sworn to and subscribed before me, 19th June, 1871.

Jethro W. Manning, Notary Public, F. C., Georgia.

Westmoreland *vs.* The State af Georgia.

GEORGIA—FULTON COUNTY:

Personally appeared before me J. R. P. Carlton, who, being duly sworn, deposes and says : that he was one of the jury which tried H. Westmoreland at this Term. On Monday morning between daylight and sunrise, he went out of the back door of the Air Line House, about fifty steps into the back door of a barber-shop which fronts on Alabama street; the front door of the shop was closed; no one was present when he entered except the negro boy who cleans up the shop. I asked him if I could get a shave quickly? he said, "yes," and called to the barber, who had not gotten up; he, a negro, came in and shaved me. I paid for the shave to a white man, who had just come in, and went back out of the back door of the shop into the back door of the hotel to the jury room. The front door of the shop was opened just as I was leaving, but no one was present while I was there except as aforesaid; and I spoke to no one while I was from the jury, nor any one to me except as aforesaid.

When the jury were passing the Baptist Church, Sunday morning, there was a temporary separation of the jury by several of them stopping at the church steps, while the others walked some distance down Mitchell street; the bailiff was present; it was a mere temporary stop, to see if the jury would not go down Washington street, and no one was present but the jurymen and bailiff, and no conversation was had with any one but the jury and bailiff, and that only as to the street on which he wished the jury to go.

He further states that he had requested the bailiff on Sunday morning to bring some one to shave the jury, and he did not, and deponent went to the shop Monday, as aforesaid, with no intention of doing wrong, thinking it could do no harm.                              J. R. P. CARLTON.

Sworn to and subscribed before me, 11th June, 1871.

S. B. HOYT, Notary Public.

GEORGIA—FULTON COUNTY :

Personally appeared before me, the attesting officer, Thomas C. Jackson, a juror who tried Harrison Westmoreland, and being sworn deposes and says : that he has seen and heard read the affidavit of Manson Stroud, constable, made on the 19th of May, 1871, before Thomas Spencer, Justice of the Peace; of Thomas H. Poole, made June 3d, 1871, before J. H. James, Notary Public; and of J. L. Keith, made 6th June, 1871, before Daniel Pitman; and the explanatory affidavit of Stroud, made this day, before W. R. Venable, Clerk; and that this last affidavit of Stroud substantially states the truth, as to the conduct of the jury while on said case.

At one time while walking, the bailiff, Stroud, did not seem disposed to go where the jury wished, and this deponent reminded him of the Judge's permission to walk out, and did use an oath in remonstrating with the bailiff; he is in the bad habit of cursing when fretted, and was a little fretted on that occasion.

I believe the jury behaved well.   The jury had but little difficulty in the case, the trouble with making up the verdict sooner was because Poole and Harper did not agree as soon as the others.                                    T. C. JACKSON.

Sworn to and subscribed before me, this 9th June, 1871.

SIDNEY DELL, Notary Public, Fulton county, Georgia.


GEORGIA—FULTON COUNTY.

Personally appeared  before me, the attesting officer, R. B. Hicks, James W. Coker, William J. Barrett and L. F. Heflin, who being duly sworn, depose and say : that they have read the affidavits alluded to in T. C. Jackson's affidavit taken in this case, they were of said jury, and believe that the explanatory affidavit of Stroud substantially speaks the truth as to the conduct of the jury on said case.

They futhermore say that they were the part of the jury which went down Mitchell street, when some of the jury

Westmoreland *vs.* The State of Georgia.

stopped at the Baptist Church Sunday morning; that when they had gone thirty or forty yards and found that some of the jury had stopped, they sat down on the side-walk, and waited for them not exceeding two or three minutes, when they came on and joined the body.

During this separation nobody spoke to any one of the majority of the jury; nor any one of them to any one; nor did they speak to each other about the case or trial. Furthermore, they remember that Carlton and Barrett refused to drink any of the liquor brought to the jury-room; the whole quantity used is correctly represented by said explanatory affidavit.                R. B. HICKS.

JAMES W. COKER.

L. F. HEFLIN.

WILLIAM J. BARRETT.

Sworn to and subscribed before me, this 12th June, 1871.

W. R. VENABLE, Clerk.

GEORGIA—FULTON COUNTY.

Personally appeared before me, W. J. Barrett, who being duly sworn, deposeth and says: that it was Monday night after the Westmoreland case was argued, and when the jury was taken from the jury-room to be taken to supper, that the bailiff, Stroud, warned the jury not to let the bailiff Gresham come near or speak to them, (as stated in Stroud's explanatory affidavit.)   He did not say on which side the bailiff had bet.                W. J. BARRETT.

Sworn to and subscribed before me, this 12th June, 1871.

W. R. VENABLE, Clerk.

GEORGIA—FULTON COUNTY.

Personally appeared before me, Thomas G. Gresham, who being duly sworn, deposeth and says: that on Monday evening after the Westmoreland case was argued, and the jury had been carried to the jury-room, he was with a party of gentlemen at the store of Redwine & Fox, when some gentleman

proposed to give me a hat if the jury found Westmoreland guilty ; and I said I would give him one if they did not. I never made any other bet as to said case, and after that I did not go near the jury, nor did I see them till they brought their verdict into Court on Tuesday morning.

Furthermore, he says he had nothing to do with the jury during the trial, nor spoke to any of them during the trial. Indeed, he was the bailiff of the Grand Jury, and was generally outside of the court room, and said little wager was made by him more as a matter of sport than otherwise.

T. G. GRESHAM.

Sworn to and subscribed before me, 12th June, 1871.

W. R. VENABLE, Clerk.

The motion for a new trial was overruled by the Court, and counsel for prisoner excepted and alleged said ruling and decision as error.

GARTRELL & STEPHENS ; HILL & CANDLER ; T. P. WESTMORELAND, for plaintiff in error.

J. T. GLENN, Solicitor General ; A. W. HAMMOND & SON, for the State.

MONTGOMERY, Judge.

The leading features in this case present a striking similarity to those of *Choice against the State,* 31 Georgia, 424. In each case the prisoner takes mortal offense at an act towards himself done by his victim, which the latter was perfectly justified in doing. In each the prisoner is a man of dissipated habits; drinks, and broods over his imaginary wrong until he works himself up to the point of shooting down a man walking peaceably along the streets of Atlanta at the time. In each, after the commission of the crime, the attempt is made to screen the offender from punishment by a plea of insanity, resulting in each case, it is singularly

enough said, from an injury on the head, received some years before, and from superadded dissipation. Only in the result of the crime do the cases diverge from each other in any material fact. The victim in the present case escaped the death inflicted in the other by a more skillful marksman. Has the impunity with which the prisoner escaped in the one case been the temptation to the commission of the crime in the other?

Many points are made in the bill of exceptions. The following, it is believed, embraces all that are material:

1. It is alleged that in impanneling a jury, one of the jurors said he had formed and expressed an opinion from hearsay, but could give the prisoner a fair trial. The Court refused to exclude him for cause, and the prisoner challenged peremptorily. The jury was obtained before the prisoner exhausted his challenges. This refusal of the Court is alleged as error. That it is not error, see the following authorities: *Mitchum vs. The State,* 11 Georgia, 636; *Anderson vs. State,* 14 Georgia, 710; *Griffin vs. State,* 15 Georgia, 476; *Jim vs. State, Ibid,* 534; *Mercer vs. State,* 17 Georgia, 146; *Wright vs. State,* 18 Georgia, 383; *Costly vs. State,* 19 Georgia, 614; *Thompson vs. State,* 24 Georgia, 297. The Court is the trior, and no error lies to his *finding: Galloway vs. State,* 25 Georgia, 596. See 22 *Georgia Reports,* 556; 25 *Georgia Reports,* 57.

2. Again, it is objected that some of the jurors were summoned by a bailiff in attendance upon the Court, and not by the sheriff. For this cause the array was challenged. The Court overruled the objection, and this is excepted to. We fail to perceive the validity of the objection here also: *Conner vs. State,* 25 Georgia, 515; *McGuffie vs. State,* 17 Georgia, 497.

3. Another exception is, that the Court permitted a witness to testify to all of a conversation of defendant heard by him, there being parts of it which he did not hear. It may be remarked that the conversation was a desultory one, ex-

tending through an hour or two, detached portions of which were heard by witness, as they went in and out of his presence, all the witnesses during the course of the trial being placed upon the stand. We see no error in this. "If one part of a conversation is relied on as proof of a confession of the crime, the *prisoner has a right to lay before the Court* the whole of what was said in that conversation." 1 *Greenleaf's Evidence*, section 218 ; 2 *Brod. and Bing.*, 290, 291. It is nowhere said he may require the prosecution to do it. On the contrary, it is admitted " subject to all the consequences of having it considered as part of his evidence." 2 *Brod. and B.*, 191.

4. Defendant attempted to give in evidence his own sayings as to when a certain injury was inflicted upon him, and who inflicted it, made to his physician several days after the commission of the offense for which he was indicted. The rule is that complaints of physical suffering made to a physician may be testified to by him to show the extent of the injury sustained by the prisoner : 1 *Greenl. Ev.*, section 102. The rule goes no further.

5. The next objection is that the Court refused to charge the jury that if they had a reasonable doubt as to the sanity of the prisoner, they should acquit. The Court did charge the jury that the law presumes sanity until the contrary is made to appear, and that the burden of proof on this point was on the defendant; " and that it ought to be made to appear to a reasonable certainty, to your reasonable satisfaction, that at the time of the commission of the act, he did not know the nature and quality of the act, or if he did, did not know that the act was wrong." " If a man has capacity and reason sufficient to enable him to distinguish right and wrong as to the particular act in question, if he has knowledge and consciousness that the act he is doing is wrong, and will 'deserve punishment, he is, in the eye of the law, of sound memory and discretion, and is responsible for his acts. If he has not that

measure of memory and discretion he is not responsible, and should be acquitted."

After charging the law correctly as to the effect of habitual drunkenness, the Court added: " If, after a careful survey of all the testimony, you have a reasonable doubt of the defendant's guilt, you will acquit him." We think the charge as favorable to the defendant as he could have asked. It certainly warranted the jury in finding the defendant insane, upon less evidence than that required by the fifteen Judges of England, in their answers to the questions propounded by the House of Lords, after the trial of McNaughton for killing Drummond, in 1843, which answers were approved by this Court, in the *Choice* case, as sound law. Indeed, the Judge charged, in effect, all that was asked of him by the defendant. He charged that if the jury had a reasonable doubt of the prisoner's guilt, they should acquit. As he was clearly guilty, and so admitted by the line of defense adopted, unless he was insane the charge was tantamount to telling the jury that, if they had a reasonable doubt of the prisoner's sanity, they should acquit.

6. The next ground of alleged error is the refusal to grant a new trial for misconduct on the part of one or more jurors in the jury-room, during the progress of the trial which lasted several days, in that " written papers were received and sent out by some of the jurors, while they were confined, and carpet-bags received by them, and communications had with persons who were not jurors." This is sustained by the affidavit of one of the jurors, but fully explained by the affidavits of the bailiff in attendance on the jury, and of other jurors, showing no injury resulted to defendant. This Court has, however, repeatedly decided that a juror will not be heard to impeach his own verdict: *Bishop vs. The State*, 9 Ga., 125. *Mercer vs. The State*, 17 Ga., 146.

7. Another objection to the verdict was that the jury were informed that a bet had been made by a named person as

to the result of their verdict.   The affidavits show that nothing more on this point was conveyed to the jury than the mere information that a bet had been made by the person named, who was in no way connected with the case, as to the result of their deliberations.   It does not appear that " any unfair trick or artifice was employed " to influence the verdict : Wharton's Am. Cr. Law (3d ed.,) title "New Trial," p. 1026.

8. It was also shown, by affidavits, that liquor had been conveyed to the jury by the bailiff in attendance upon them, and that one of the jury had gone out of the jury-room into a barber's shop to be shaved, without the knowledge of the bailiff.   These two facts certainly threw the *onus* upon the State to show that the prisoner had not been injured by the irregularities : *Monroe vs. The State*, 5 Ga., 85. The explanation is that a small quantity of liquor, only, was furnished, and that none of the jury were at any time under its influence.   The practice of furnishing liquor in any quantity, to a jury, while they have a case under consideration, cannot be too strongly reprehended, and the bailiff should have been, and probably was, punished ; but the explanation, we think, disarms the objection of its force : Wharton's Am. Cr. Law (3d ed.,) 1020.   The other fact was sufficiently explained by the State, showing that the absent juror conversed with no one on the subject of the trial, during his absence, and returned to the jury-room as soon as the purpose for which he had absented himself was accomplished Other irregularities are charged against the jury, but entirely refuted by the affidavits introduced by the State.   See *Berry vs. The State*, 10 Ga., 525, pt. 2.   *Roberts & Copenhaven vs. The State*, 14 Ga., pt. 4.

9. The usual objections to the verdict, as contrary to law and evidence, and to the charge as inapplicable to the facts, are made and overruled.

Judgment affirmed.